# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | ) | Chapter 11 |
| Onco Investment Company, *et al.*, | ) | |
| | ) | Jointly Administered |
| *Debtors.* | ) | Bankruptcy Case No. 04-10558 (RB) |
| | ) | |
| MW Post Portfolio Fund Ltd., *et al.*, | ) | District Court Civil Action Nos. |
| | ) | 04-1543 (Lead); 04-1544; 04-1545; |
| *Appellants,* | ) | and 04-1546 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Norwest Bank Minnesota, National | ) | |
| Association (n/k/a Wells Fargo | ) | |
| Bank, MN, National Association), *et al.*, | ) | |
| | ) | |
| *Appellees.* | ) | |

## APPELLANTS' ANSWERING BRIEF
## IN RESPONSE TO MOTION TO DISMISS APPEAL

Appellants MW Post Portfolio Fund Ltd., DB Distressed Opportunities Fund, Ltd., Post Opportunity Fund, L.P., Post Total Return Fund, L.P., HFR DS Opportunity Master Trust, The Opportunity Fund LLC, MW Post Opportunity Offshore Fund, Ltd., South Dakota Investment Council, Concordia Mac29 Ltd., JME Opportunity Partners, LLC, JME Offshore Opportunity Fund, Ltd., JME Offshore Opportunity Fund II, Ltd., Restoration Capital Management LLC, Restoration Holdings Ltd., and Litespeed Master Fund, Ltd. (collectively, the "Senior Noteholders"), hereby object to the Appellees' Motion to Dismiss these consolidated appeals.

This Objection is based upon the accompanying Declaration of A. Brent Truitt and the attached points and authorities.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

       A.    Oglebay's Subordinated Notes. ....................................................................... 3

       B.    Oglebay's Senior Notes. .................................................................................. 5

       C.    Oglebay's Default Of The Senior Notes. ...................................................... 6

       D.    The Litigation Regarding Subordination And
             The Plan's Savings Clause With Respect To The Litigation. ..................... 7

III.   ARGUMENT ........................................................................................................... 14

       A.    The Orders Are Final. .................................................................................... 14

       B.    The Case Is Not Moot. ................................................................................... 18

             1.    The Case Is Not Constitutionally Moot Because
                   The Court Can Order Effectual Relief. .......................................... 21

             2.    The Case Is Not Equitably Moot Because The Relief
                   Sought By The Senior Noteholders Would Not Require
                   Undoing Oglebay's Reorganization. .............................................. 25

             3.    The Confirmation Order Is Not Preclusive Because
                   The Plan Preserved, Rather Than Adjudicated,
                   The Controversies At Issue On Appeal. ......................................... 29

             4.    The Senior Noteholders Do Not Seek To
                   Modify Oglebay's Plan. ................................................................... 33

IV.    CONCLUSION ....................................................................................................... 34

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3d 551 (3d Cir. 1997).................15

*Bebout v. Norfolk & Western Railway Co.*, 982 F.2d 1178 (7th Cir. 1993).....................17

*Bethel v. McAllister Bros., Inc.*, 81 F.3d 376 (3d Cir. 1996)...........................................15

*In re BH&P Inc.*, 949 F.2d 1300 (3d Cir. 1991)..............................................................17

*Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines*,
    296 F.3d 624 (7th Cir. 2002) ......................................................................................31

*Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*,
    156 F.3d 1114 (11th Cir. 1998) ....................................................................................9

*Coltec Industries, Inc. v. Hobgood*, 280 F.3d 262 (3d Cir. 2002) ....................................24

*Corestates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187 (3d Cir. 1999).....................32

*Donovan v. Punxsutawney Area School Board*, 336 F.3d 211 (3d Cir. 2003) ............24,25

*Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp.*
    *(In re Ionosphere Clubs, Inc.)*, 262 B.R. 604 (Bankr. S.D.N.Y. 2001) .......................30

*In re EXDS, Inc.*, 316 B.R. 817 (Bankr. D. Del. 2004).....................................................30

*Ford Motor Co. v. Transport Indemnity Co.*, 795 F.2d 538 (6th Cir. 1986) ...............16-17

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) .................................15

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000) .......................................................................................28

*Horn v. Berdon, Inc. Defined Benefit Pension Plan*, 938 F.2d 125 (9th Cir. 1991).........16

*HSBC Bank USA v. Branch (In re Bank of New England Corp.)*,
    364 F.3d 355 (1st Cir. 2004).........................................................................................9

*Jersey Central Power & Light Co. v. State of New Jersey*,
    772 F.2d 35 (3d Cir. 1985) ....................................................................................24,25

*Johns-Manville Corp. v. Colorado Insurance Guaranty Ass'n*
    *(In re Johns-Manville Corp.)*, 91 B.R. 225 (Bankr. S.D.N.Y. 1988) ..........................29

*Maxwell Communication Corp. v. Societe Generale*
    *(In re Maxwell Communication Corp.)*, 93 F.3d 1036 (2d Cir. 1996).........................30

*Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285 (11th Cir. 2004) .........31

*Official Bondholders Committee v. The Chase Manhattan Bank*
    *(In re Marvel Entertainment Group, Inc.)*, 209 B.R. 832 (D. Del. 1997) ...................17

*Price v. Delaware State Police Federal Credit Union (In re Price)*,
    370 F.3d 362 (3d Cir. 2004) .......................................................................21

*Professional Insurance Management v. The Ohio Casualty Group of Insurance Cos.*
    *(In re Professional Insurance Management)*, 285 F.3d 268 (3d Cir. 2002)...............17

*In re PWS Holdings Corp.*, 228 F.3d 224 (3d Cir. 2000) ...........................................27,28

*Resorts Int'l Financing, Inc. v. Price Waterhouse & Co., LLP*
    *(In re Resorts Int'l, Inc.)*, 372 F.3d 154 (3d Cir. 2004) .........................................29-30

*Scola v. Beaulieu Wielsbeke, N.V.*, 131 F.3d 1073 (1st Cir. 1997)...................................16

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*,
    315 F.3d 217 (3d Cir. 2003) ...................................................................21,27,28

*U.S. Trustee v. Official Committee of Equity Security Holders*
    *(In re Zenith Electronics Corp.)*, 329 F.3d 338 (3d Cir. 2003) ...............21,26-27,28,29

*Venuto v. Witco Corp.*, 117 F.3d (3d Cir. 1997)..................................................................31

**Statutes and Rules**

11 U.S.C. § 510.........................................................................................................9

11 U.S.C. § 1124.......................................................................................................1

Fed. R. Bankr. P. 7054............................................................................................24

Fed. R. Bankr. P. 8003............................................................................................17

**Other Authority**

7 *Collier on Bankruptcy* ¶ 1101.02 (15th ed. rev. 2005) ..................................................27

Dan Schechter, "Recent Developments,"
    2004 *Comm. Fin. News.* 83 (Nov. 15, 2004) ................................................................2

## I.   INTRODUCTION

The Senior Noteholders own Senior Notes issued by Appellee Oglebay Norton Company ("Oglebay"). The Senior Notes are senior to Subordinated Notes issued by Oglebay pursuant to an Indenture with Appellee Wells Fargo Bank (the "Indenture Trustee") and held of record by Appellee The Depository Trust Company ("DTC"). The Subordinated Notes Indenture requires that all obligations in respect of the Senior Notes be satisfied in full prior to payment of the Subordinated Notes.

In its bankruptcy case, Oglebay confirmed a Plan of Reorganization that left the Senior Notes "unimpaired" by authority of section 1124(2) of the Bankruptcy Code. Section 1124(2) provides that the holder of a claim left "unimpaired" under a plan is to retain "the legal, equitable, or contractual rights to which such claim . . . entitles the holder." 11 U.S.C. § 1124(2). In the case of the Senior Notes, those "legal, equitable, or contractual rights" include the right to enforce provisions of the Indenture that provide for any payments on the Subordinated Notes to be turned over to holders of the Senior Notes until the time of full payment.

Although Oglebay's Plan purported to cure all defaults and reinstate the Senior Notes, it did not completely satisfy the Senior Notes. More than $11.3 million in acceleration premium and default interest due with respect to the Senior Notes remain unpaid. Yet, Oglebay's Plan also provided for significant distributions in respect of the Subordinated Notes. Because they have not been paid all amounts due under their contract, the Senior Noteholders – as holders of the "unimpaired" Senior Notes – seek in this litigation to enforce the subordination provisions of the Indenture and recover the distributions made to holders of the junior Subordinated Notes (or their monetary equivalent) until such time as the Senior Notes are satisfied in full.

-1-

In the adversary proceeding that gave rise to this appeal, the Bankruptcy Court determined that Oglebay's cure and reinstatement of the Senior Notes deprived the Senior Noteholders of the right to recover their share of the additional $11.3 million due on account of the Senior Notes. In the briefing on the merits of this appeal, the Senior Noteholders will demonstrate that the Bankruptcy Court's determination was incorrect and contrary to established law.[1] The Appellees, however, now want to deprive the Senior Noteholders of the opportunity even to make their case, seeking to dismiss the appeal on a host of contradictory theories.

In their zeal to avoid a determination on the merits, the Appellees ignore a critical provision of the Plan, disregard the history of this litigation, and cite cases that are not remotely applicable to the facts of this dispute. As demonstrated in this Brief, this appeal is from final judgments entered in a separate adversary proceeding commenced by the Senior Noteholders specifically for a resolution of the issues regarding subordination. This is <u>not</u> an appeal from the order confirming Oglebay's Plan, and this case has <u>not</u> been made moot by the alleged consummation of that Plan. To the contrary, as the Appellees well know, ***the Plan specifically preserves the Senior Noteholders' right to litigate enforcement of the subordination provisions notwithstanding confirmation of the Plan***. Specifically, the Plan states:

> [A]ny and all rights, arguments and defenses relating to the subordination provisions contained in the Old Senior Subordinated Note Indenture <u>are expressly preserved</u> solely for the holders of [the Senior Notes] . . . and shall be enforced in accordance with a

---

[1]    As one commentator recently explained in critiquing the Bankruptcy Court's opinion in this case, "this court went too far in holding that every such cure irrevocably 'unrings the bell' or unscrambles the omelet, for all purposes and all parties. The court did not have to make such a broad holding, nor is the holding supported by the language of the Code." Dan Schechter, 2004 *Comm. Fin. News.* 83 (Nov. 15, 2004).

> Final Order of the Bankruptcy Court resolving the parties'
> respective rights under such subordination provisions.

(Plan § XI.C.4.)  This provision was added to the Plan at the demand of the Senior

Noteholders and for the express purpose of ensuring that the claims now at issue on

appeal, asserted in a separate adversary proceeding distinct from the litigation over

Oglebay's Plan, would not be foreclosed by confirmation of the Plan.  Neither the

Bankruptcy Court nor any other court has ever held or intimated that the Plan precludes

the claims asserted by the Senior Noteholders in this litigation.

In the face of the clear preservation of the right to litigate the claims at issue in

this appeal, the Appellees' assertions that the Plan is *res judicata* as to the preserved

claims, and that consummation of the Plan has rendered the preserved claims moot, are

flatly wrong.  This appeal presents a live controversy as to which, as contemplated by the

Plan, the Court can grant effectual relief.  The Senior Noteholders therefore request that

the Court deny the Motion to Dismiss and proceed to address the merits of the appeal.


## II.    FACTUAL AND PROCEDURAL BACKGROUND

The following is a brief summary of the facts and procedural history necessary for

an understanding of the reasons why the Appellees' Motion to Dismiss should be denied,

as well as a basic understanding of the underlying controversy that is now before the

Court on appeal.  The Senior Noteholders will present a complete statement of the facts,

after resolution of the Motion to Dismiss, in their opening brief on the merits.

### A.    Oglebay's Subordinated Notes.

In 1999, Oglebay issued $100 million in Subordinated Notes under an Indenture

between Oglebay, certain guarantors, and Norwest Bank Minnesota, National

Association, the predecessor in interest to the Indenture Trustee. (Reinthaler Aff., Ex. G

(the "Indenture").)[2]

The Indenture provides for the total and complete subordination of the

Subordinated Notes to "the prior indefeasible payment and satisfaction in full in cash of

all existing and future Senior Indebtedness." (Indenture § 11.01.)  In the event that

Oglebay files a bankruptcy case, holders of Senior Indebtedness are entitled to any

distributions otherwise allocable to holders of the Subordinated Notes until the Senior

Indebtedness is paid in full:

> (1) [T]he holders of Senior Indebtedness shall be entitled to
> receive payment and satisfaction in full in cash of all amounts due
> on or in respect of all Senior Indebtedness, before the Holders of
> the [Subordinated] Notes are entitled to receive or retain any
> payment or distribution of any kind or character on account of
> principal of, premium, if any, or interest on the [Subordinated]
> Notes; and (2) any payment or distribution of assets of the
> Company of any kind or character, whether in cash, property or
> securities, by set-off or otherwise, to which the Holders [of
> Subordinated Notes] would be entitled but for the provisions of
> this Article Eleven shall be paid by the liquidating trustee or agent
> or other Person making such payment or distribution, whether a
> trustee in bankruptcy, a receiver or liquidating trustee or otherwise,
> directly to the holders of Senior Indebtedness . . . to the extent
> necessary to make payment in full in cash of all Senior
> Indebtedness remaining unpaid . . . .

(Indenture § 11.02.)  If distributions are made to holders of the Subordinated Notes in

violation of the subordination provisions, such holders are obligated to return the

distributions so that they may be reallocated to holders of Senior Indebtedness.  (*Id.*)

---

[2]    This Brief uses the following abbreviations for citations to documents in the record:
"Memo." for the Appellees' Memorandum of Law in support of their Motion to
Dismiss; "Brodnicki Aff." for the Affidavit of Paul J. Brodnicki in support of the
Appellees' Motion; "Reinthaler Aff." for the Affidavit of Richard W. Reinthaler in
support of the Appellees' Motion; "Walk Aff." for the Affidavit of Rochelle F. Walk
in support of the Appellees' Motion; and "Truitt Decl." for the accompanying
Declaration of A. Brent Truitt.

**B.     Oglebay's Senior Notes.**

In October 2002, Oglebay issued $75 million in Senior Notes under a Senior Secured Note Purchase Agreement among Oglebay, certain guarantors, and various purchasers. (Reinthaler Aff., Ex. J (the "Senior Notes Agreement").) Each of the Senior Noteholders is a holder, or investment advisor to one or more holders, of Senior Notes. (Reinthaler Aff., Ex. E (the "Complaint"), ¶ 19.)

The Senior Notes have two key provisions that are at issue in this appeal. *First*, the Senior Notes Agreement provides that, if the Senior Notes are accelerated (whether due to a default or otherwise) prior to October 25, 2004, an acceleration premium is due in an amount equal to 18% of the outstanding principal amount, such that upon acceleration the total amount due is 118% of the principal amount plus all accrued and unpaid interest. (Senior Notes Agreement § 9.1.) (If acceleration occurs between October 25, 2004, and October 25, 2005, the acceleration premium decreases to 6% of the principal amount, and the premium decreases further if acceleration happens after October 25, 2005. *Id.* § 2.5.2.) *Second*, the Senior Notes Agreement provides for default interest to accrue after an event of default at a rate that is the contract rate plus 2%. (*Id.* § 2.6.)

Oglebay's obligations with respect to the Senior Notes are for money borrowed, are evidenced by notes, and are expressly denominated as senior to the Subordinated Notes. (*Id.* § 2.11.) As a consequence, there is no question that the Senior Notes constitute "Senior Indebtedness" and are entitled to the benefits of the subordination provisions of the Indenture.[3]

---

[3]     "*Senior Indebtedness*" includes "all Obligations due pursuant to the terms of . . . all other Indebtedness of [Oglebay] which does not provide that it is to rank PARI

**C.    Oglebay's Default Of The Senior Notes.**

On January 30, 2004, Oglebay announced that it would not make the interest payment due on February 2, 2004, on the Subordinated Notes. (Complaint ¶ 40.) The Senior Noteholders assert that this caused an "Event of Default" under the Senior Notes Agreement (which provides that Oglebay's admission "in writing [of] its inability to pay . . . its debts as they mature or become due" constitutes an Event of Default), which in turn resulted in automatic acceleration of the Senior Notes. (Senior Notes Agreement § 9.1.) On February 23, 2004, Oglebay filed its bankruptcy petition, which was an independent Event of Default and cause for acceleration of the Senior Notes. (*Id.*)

As a consequence, as of at least February 23, 2004 (if not earlier), the acceleration premium was triggered and the amount due with respect to Senior Notes was nearly $100 million, with default interest accruing from the date of default. All of that outstanding amount constituted "Senior Indebtedness" entitled to the benefits of the Indenture's subordination provisions.[4]

---

PASSU with or subordinate to the [Subordinated] Notes." "*Obligations*" include "any Indebtedness, any principal, interest (including post-petition interest), penalties, fees, indemnifications, reimbursement obligations, damages and other liabilities payable under the documentation governing such Indebtedness." "*Indebtedness*" includes "every obligation . . . for money borrowed [and] every obligation . . . evidenced by bonds, debentures, notes or other similar instruments." (*See* Complaint, ¶¶ 32-34.)

[4]    The acceleration premium constitutes "penalties, fees . . . damages and[/or] other liabilities payable under the documentation governing" the Senior Notes and, therefore, falls within the definition of "*Obligations*" (and, thus, "*Senior Indebtedness*") under the Indenture. Similarly, the default interest due on the Senior Notes constitutes "interest (including post-petition interest)" and/or "other liabilities payable under the documentation governing" the Senior Notes and thus also constitutes "*Senior Indebtedness*."

**D.    The Litigation Regarding Subordination And The Plan's Savings Clause
With Respect To The Litigation.**

The chronology of this litigation and Oglebay's bankruptcy case is important to

an understanding of why the Appellees' claim that the Plan precludes this appeal is so

disingenuous.  The chronology reveals that the Senior Noteholders litigated their claims

diligently and that the Plan "expressly preserves" the very issues that are now before the

Court on appeal.  The Senior Noteholders never sought a second or third "bite at the

judicial apple," as the Appellees suggest.  They litigated and lost before the Bankruptcy

Court.  All that they seek now is that which Congress has guaranteed them – a full and

fair appellate review of the Bankruptcy Court's adverse decision.

The seeds of this controversy were sown in <u>April 2004</u>, when Oglebay filed a plan

of reorganization that proposed to pay the Senior Notes without any of the acceleration

premium or default interest provided for under the Senior Notes Agreement.  (Reinthaler

Aff., Ex. M, § III.B.3.)  Despite the failure to pay the Senior Notes in full, Oglebay's plan

further provided for holders of Subordinated Notes to receive New Common Stock, with

distributions to be made to the Indenture Trustee pursuant to the Indenture.  (*Id.*

§ III.C.1.)  As such, the plan clearly failed to enforce the subordination provisions of the

Indenture, as it provided for distributions to be made in respect of the junior

Subordinated Notes prior to the payment in full of the Senior Notes.

In <u>June 2004</u>, the Senior Noteholders initiated this litigation against Oglebay and

the Indenture Trustee to contest the proposed treatment of the Senior Notes under

Oglebay's plan and to enforce their rights under the subordination provisions of the

Indenture.  (Reinthaler Aff., Ex. O.)  In their complaint, the Senior Noteholders sought

(a) a declaration that the full 18% acceleration premium and all accrued default interest

were "Senior Indebtedness" and thus required to be paid in full prior to any distributions in respect of the Subordinated Notes; (b) an order directing the Indenture Trustee, as the prospective recipient of distributions on account of the Subordinated Notes, to turn over any property received until such time as the Senior Notes were satisfied in full; or (c) alternatively, money damages to compensate for the violation of the Senior Noteholders' subordination rights. (*Id.* at 17-18.)

Shortly thereafter, on July 1, 2004, Oglebay filed its first amended plan of reorganization. (Reinthaler Aff., Ex. N.)  In that plan, Oglebay altered the proposed treatment of the Senior Notes but still did not fully account for the acceleration premium or default interest due under the Senior Notes Agreement. (*Id.* § III.C.1.)  Like the first plan, the amended plan provided for holders of Subordinated Notes to receive New Common Stock, with distributions to be made to the Indenture Trustee pursuant to the Indenture. (*Id.* § III.C.3.)

On July 16, 2004, the Senior Noteholders objected to the proposed Disclosure Statement that Oglebay filed with respect to the first amended plan, asserting that the plan could not be confirmed due to its violation of the subordination provisions of the Indenture and noting numerous deficiencies in the disclosures made with respect to the Senior Notes. (Truitt Decl., Ex. A.)

Thereafter, on the eve of a July 27, 2004, Bankruptcy Court hearing on the proposed Disclosure Statement, two important things happened. *First*, Oglebay amended its plan yet again, by filing a second amended plan that ultimately became the plan that Oglebay advanced to confirmation (the "Plan"). (Reinthaler Aff., Ex. H.)  That amended Plan changed tactics with respect to the Senior Notes.  Rather than providing for the Senior Notes as impaired claims, the Plan treated the Senior Notes as "unimpaired" (a

bankruptcy term of art premised upon section 1124 of the Bankruptcy Code), with Oglebay to "reinstate" its obligations for a moment in time and then, upon effectiveness of the Plan (which was to occur after October 25, 2004), to immediately redeem the Senior Notes through a payment of 106% of the outstanding principal amount, plus accrued interest at the non-default rate.  (Plan § III.B.3.)

By this maneuver, Oglebay was able to wipe away the existing defaults and preclude holders of the Senior Notes from claiming, against Oglebay, the full 18% acceleration premium and the default interest promised to them in the Senior Notes Agreement.  Oglebay deemed this treatment to be "payment in full," but in reality it resulted in a payment deficiency of more than $11.3 million in acceleration premium and default interest clearly due in respect of the Senior Notes.

Applicable law provides that intercreditor subordination agreements like the Subordinated Notes Indenture are enforceable against subordinated creditors even as to amounts that are disallowed as against the debtor.  Thus, for example, even when a senior creditor's claim for postpetition interest is disallowed and rendered unenforceable against the debtor, the senior creditor can enforce its subordination rights and recover the disallowed postpetition interest from distributions that otherwise would be made to the subordinated creditor when the subordination agreement provides for such a recovery.[5] Thus, even though Oglebay's Plan rendered the Senior Noteholders' claims for the full acceleration premium and default interest unenforceable as against Oglebay, the Senior Noteholders remained entitled to enforce their subordination rights and to recover on

---

[5]    11 U.S.C. § 510(a); *see, e.g.*, *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355 (1st Cir. 2004); *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114 (11th Cir. 1998).

those claims from any amounts that Oglebay otherwise would distribute on account of the Subordinated Notes.

Yet, the Plan did not provide for this. Instead, despite the nonpayment of the Senior Notes, the Plan provided for holders of Subordinated Notes to receive nearly 3 million shares of New Common Stock, which Oglebay valued at approximately $24 million. (Plan § III.C.2.) Curiously, and apparently in response to the litigation initiated by the Senior Noteholders, the Plan also provided for those distributions to be made not to the Indenture Trustee, as required by the Indenture and as contemplated in Oglebay's first two proposed plans, but instead directly to DTC, the sole record owner of the Subordinated Notes. (Plan § VI.D.1.b.)

The *second* important development on the eve of the July 27, 2004, hearing was that the Senior Noteholders agreed to resolve their objection to Oglebay's proposed Disclosure Statement, and to the let the Plan proceed to the confirmation stage, in exchange for several important modifications that Oglebay agreed to make to the Plan and Disclosure Statement. One modification was to the Disclosure Statement, which was revised to address the impact of the litigation that the Senior Noteholders had commenced to enforce the subordination provisions of the Indenture. Specifically, at the demand of the Senior Noteholders, Oglebay amended the Disclosure Statement to warn holders of the Subordinated Notes that: "A resolution [of the litigation] by the Bankruptcy Court in favor of holders of the Old Senior Secured Notes may dilute the ultimate recovery of Class 7 Claims under the Plan, which may result in the holders of such Claims [*i.e.*, holders of Subordinated Notes] not receiving the amount of New

Common Stock described in the Disclosure Statement." (Truitt Decl., Ex. B (the "Disclosure Statement"), at 27) (emphasis added)).[6]

The other important modification was made to the Plan itself. Again at the demand of the Senior Noteholders, and as a condition to resolving their objections to the Disclosure Statement, Oglebay added Section XI.C.4. to the Plan to address the Senior Noteholders' pending litigation.[7] As described in detail in Section III.B. of this Brief, this provision of the Plan is a savings clause that "expressly preserves" the Senior Noteholders' right to litigate enforcement of the Indenture's subordination provisions "notwithstanding" confirmation of the Plan. (Plan § XI.C.4.)

With those important modifications in place, and thus the assurance that the Plan would not somehow foreclose their ability to enforce the subordination provisions through the pending litigation before the Bankruptcy Court, the Senior Noteholders consented to the Disclosure Statement and Oglebay proceeded to solicit votes on the Plan. (Because Oglebay deemed the Senior Notes to be "unimpaired" under the Plan, Oglebay did not solicit the votes of the Senior Noteholders.)

Concurrently, due to the change in the Plan that provided for distributions on the Subordinated Notes to be made to DTC (the sole record owner of the notes), the Senior Noteholders amended their complaint to add DTC as a defendant. (Complaint ¶ 22.) The

---

[6]    As Oglebay's counsel explained at the hearing on the Disclosure Statement, in order to "resolve" the Senior Noteholders' objection, "we [will] provide the disclosure to holders of the Unsecured Bonds that their recovery could be diluted if the Court agrees with the Noteholders regarding the effect of the subordination on distribution." (Truitt Decl., Ex C (the "7/27/04 Transcript"), at 18.)

[7]    See 7/27/04 Transcript at 21-22 (counsel for Senior Noteholders explaining objection), and at 47-48 (counsel for Oglebay agreeing to resolve objection by including "a reservation of rights or some similar language . . . to indicate that – whatever contractual rights they have – . . . that matter will be resolved by the Court at the appropriate time").

Appellees answered and the Indenture Trustee asserted six counterclaims for declaratory relief, three in opposition to the declaratory relief sought by the Senior Noteholders and three alleging that certain Senior Notes (those issued on a "paid in kind" or "PIK" basis), did not qualify as "Senior Indebtedness" under the Indenture and should be subordinated to the Subordinated Notes. (Reinthaler Aff., Ex. F, ¶¶ 127-38.)

Ultimately, the Senior Noteholders filed a motion for summary judgment, the Indenture Trustee cross-moved for summary judgment, and DTC moved to dismiss. The motions of the Senior Noteholders and the Indenture Trustee were argued on September 23, 2004, and on <u>September 27, 2004</u>, before any hearing on confirmation of the Plan, the Bankruptcy Court issued a memorandum decision denying the Senior Noteholders' motion and granting the Indenture Trustee's cross-motion. (Reinthaler Aff., Exs. A, B, Z.) The Bankruptcy Court reasoned that the "cure and reinstatement" of the Senior Notes as proposed in Oglebay's Plan served to "roll back the clock to the time before the default existed," not just vis-à-vis the Senior Noteholders and Oglebay but "as to all parties and for all purposes," as if the obligations in respect of the acceleration premium and default interest never existed at all and thus were never subject to the Indenture's subordination provisions. (Reinthaler Aff., Ex. Z, at 8.)[8]

---

[8]    Because DTC was not originally a defendant, the Senior Noteholders were unable to proceed with a summary judgment motion as to DTC on the same schedule as the other defendants. When permitted to do so by the applicable rules, the Senior Noteholders promptly filed a motion for summary judgment against DTC, asserting the same grounds as the motion filed with respect to the other defendants, and DTC moved to dismiss. On <u>November 12, 2004</u>, the Bankruptcy Court denied the Senior Noteholders' motion and granted DTC's motion on exactly the same grounds as those that served as the basis for the decision with respect to the other defendants. (Reinthaler Aff., Exs. C, D, GG.)

The Bankruptcy Court subsequently conducted a hearing on confirmation of Oglebay's Plan over four days, commencing on September 29 and concluding on October 4, 2004. Because the Bankruptcy Court previously had ruled against them in the litigation regarding subordination, and because the Plan's savings clause "expressly preserved" the Senior Noteholders' rights in that litigation, the Senior Noteholders began preparing an appeal in the subordination litigation and pursued only one objection to confirmation of the Plan. Specifically, at the confirmation hearing, the Senior Noteholders contended only that, in light of the Bankruptcy Court's decision in the subordination litigation, the treatment of the Senior Notes under the Plan rendered the Senior Notes "impaired" as a matter of law (because it served to alter the rights of holders of the Senior Notes with respect to the acceleration premium and default interest) and that, as a result, the Plan could not be confirmed because the votes of the Senior Noteholders had not been solicited. (Brodnicki Aff., Ex. E, at 73-75.)

The Bankruptcy Court overruled the Senior Noteholders' objections "[f]or the reasons set forth in [the] memorandum of decision on their summary judgment in the adversary proceeding" and, on November 17, 2004, entered an order confirming the Plan. (Reinthaler Aff., Ex. AA, at 109-10; Ex. EE.) Meanwhile, on November 24, 2004, just days after the Bankruptcy Court had disposed of the Senior Noteholders' remaining claims against DTC (see footnote 8, above) and thus had rendered a final judgment susceptible to appeal, the Senior Noteholders filed their notices of appeal of the four relevant orders of the Bankruptcy Court in this litigation (collectively, the "Orders"). (Brodnicki Aff., Exs. A-D.)

The Senior Noteholders did not appeal the Bankruptcy Court's confirmation order, meaning that the issue of whether the Senior Notes were "impaired" under the Plan

has now been resolved, once and for all.  For the reasons described below, however, the primary question at issue in this appeal – whether, given the "unimpairment" of the Senior Notes under the Plan, the Senior Noteholders are entitled to enforce the Indenture's subordination provisions with respect to the acceleration premium and default interest – is very much alive and ready for determination by this Court.

### III.    ARGUMENT

The Appellees argue that the Court must dismiss this appeal because the Bankruptcy Court's Orders are not final and because consummation of Oglebay's Plan has made the case moot or otherwise nonjusticiable.  Neither contention is correct.

### A.    The Orders Are Final.

The Appellees first argue that, because the Bankruptcy Court did not rule upon the Indenture Trustee's three counterclaims, the Orders are not final, appealable orders in the absence of a Rule 54(b) certification.  (Memo. at 20-22.)[9]

The Appellees are correct that, ordinarily, a party may not appeal an order that adjudicates some but not all claims in a case without a certification under Rule 54(b).  That general rule, however, applies only when there remains something left for the trial court to adjudicate.  The Third Circuit has made it clear that an order that fails to dispose of all of the claims before the trial court is a final, appealable order when the

---

[9]    In the very next breath, the Appellees state that Rule 54(b) certification is unavailable due to confirmation of Oglebay's Plan.  (Memo. at 22.)  The Appellees thus pursue two theories that directly conflict with each other.  On one hand, they claim that the Orders are not final because litigation remains before the Bankruptcy Court; on the other, they assert that all future litigation is now concluded (and precluded) by virtue of the confirmation order.

circumstances are such that, notwithstanding the unadjudicated claims, there is nothing left for the trial court to do.

> [T]o determine the effect of a district court's decision – and therefore to determine whether there is a final order – it is sometimes necessary to look beyond the pleadings. A final order is not absent just because the district court failed to adjudicate all of the claims that were at one time pleaded. Instead, an appellate court must determine whether, at the time it is examining its jurisdiction, there remain unresolved issues to be adjudicated in the district court. Even if the appeals court would have lacked jurisdiction at the time an appeal was filed, the court has jurisdiction if, as a result of subsequent events, there are no longer any claims left to be resolved by the district court.

*Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3d 551, 557 (3d Cir. 1997) (emphasis added); *see, e.g. Bethel v. McAllister Bros., Inc.*, 81 F.3d 376, 381 (3d Cir. 1996) ("it is well established that otherwise non-appealable orders may become appealable where circumstances foreclose the possibility of piecemeal litigation").

Or, as the Third Circuit put it more succinctly, jurisdiction exists "when the [trial] court has divested itself of the case entirely." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 198 n.3 (3d Cir. 2001). That is the case here. Despite the fact that the Bankruptcy Court did not formally decide the Indenture Trustee's three counterclaims (and the Indenture Trustee in fact never did anything whatsoever to prosecute those counterclaims or present them for adjudication), there is now nothing left for the Bankruptcy Court to do with respect to this litigation.

In its three nominally outstanding counterclaims, the Indenture Trustee asserted that certain Senior Notes did not qualify as "Senior Indebtedness" under the Indenture and in fact should be subordinated to the Subordinated Notes. If this Court were to affirm the Bankruptcy Court's Orders now on appeal, those counterclaims could not and would not ever go forward. Rather, the treatment of the Senior Notes as set forth in the

Plan would stand, and the controversies among the parties would be at an end absent a further appeal. The counterclaims would only have relevance in the event that this Court reverses the Bankruptcy Court's Orders (which, as the Senior Noteholders will demonstrate in their brief on the merits, the Court should do). In that event, the Indenture Trustee will be free to litigate its counterclaims if it so chooses.

As Oglebay's counsel explained to the Bankruptcy Court in January of this year: "The only remaining controversy in this [bankruptcy] case is not in front of the Bankruptcy Court. It [is] now at the appellate level in the District Court." (Truitt Decl., Ex. D, at 10 (emphasis added).) Oglebay's counsel assured the Bankruptcy Court that there was nothing for the Court to do unless the case was remanded. (*Id.* at 12.)[10]

Thus, until a reversal and remand, the litigation before the Bankruptcy Court is concluded, and the Orders on appeal therefore are final. *See, e.g., Scola v. Beaulieu Wielsbeke, N.V.*, 131 F.3d 1073, 1074 (1st Cir. 1997) (order final even though counterclaim was never formally adjudicated, where summary judgment made counterclaim moot); *Horn v. Berdon, Inc. Defined Benefit Pension Plan*, 938 F.2d 125, 126 n.1 (9th Cir. 1991) (order final even where "order granting summary judgment did not dispose of defendant's counterclaim," because counterclaim was dependent on plaintiff's success on the underlying claims); *Ford Motor Co. v. Transport Indemnity Co.*, 795 F.2d 538, 543 (6th Cir. 1986) (because there was nothing left to litigate, order

---

[10]    The Appellees consistently have acted as if the litigation before the Bankruptcy Court has concluded. They readily concede that the Indenture Trustee never sought any adjudication with respect to the counterclaims. (Memo. at 15.) In pleadings before the Bankruptcy Court, the Indenture Trustee stated that the Orders entered by the Bankruptcy Court would "substantively resolve[]" the litigation. (Truitt Decl., Ex. E, at n.5.) Similarly, in seeking fees in connection with the litigation, the Indenture Trustee boasted that it "sought and obtained dismissal of the Plaintiffs' complaint in the Adversary Proceeding." (Truitt Decl., Ex. F, at 2.)

final even though "[t]he district court failed in either of its opinions to address these counterclaims"); *see also Bebout v. Norfolk & Western Railway Co.*, 982 F.2d 1178, 1179 n.1 (7th Cir. 1993) ("the judgment of the district court was final despite the absence of a definitive ruling on Norfolk & Western's counterclaim because it has waived this counterclaim by failing to pursue it at the trial level").

This conclusion is reinforced by the fact that this is a bankruptcy case. As the Third Circuit recently noted, "considerations unique to bankruptcy appeals have led us consistently in those cases to construe finality in a more pragmatic, functional sense than with the typical appeal." *Professional Insurance Management v. The Ohio Casualty Group of Insurance Cos. (In re Professional Insurance Management)*, 285 F.3d 268, 281 (3d Cir. 2002) (order final even where "the Bankruptcy Court is still considering the resolution of significant issues between these two parties"). One key inquiry made by the Circuit in considering the finality of orders entered in bankruptcy cases is whether the trial court "conclusively determined the question presented by this appeal." *In re BH&P Inc.*, 949 F.2d 1300, 1307 (3d Cir. 1991) (quoting *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105 (3d Cir. 1988)).

Here, everyone agrees that the Bankruptcy Court's Orders conclusively determined the issue now on appeal. Those Orders therefore are final and ripe for appellate consideration by this Court.[11]

---

[11]    Alternatively, even if the Court were to find that the Orders technically are not final due to the nominally-pending counterclaims, the Court can treat the Senior Noteholders' notice of appeal as a request for leave to appeal. Fed. R. Bankr. P. 8003(c); *Official Bondholders Committee v. The Chase Manhattan Bank (In re Marvel Entertainment Group, Inc.)*, 209 B.R. 832, 837 (D. Del. 1997). The Senior Noteholders hereby request that the Court do so. The standards for interlocutory review, as recited in *Marvel Entertainment*, are satisfied here, as the Orders involve a controlling question of law as to which there is substantial ground for difference of

**B.    The Case Is Not Moot.**

The Appellees argue that the Court must dismiss this appeal because Oglebay's Plan has been confirmed and consummated. Their argument comes in four varieties. They claim that the case is "constitutionally moot," "equitably moot," barred by *res judicata*, and barred by provisions of the Bankruptcy Code that preclude modifications to a consummated plan. Each argument is premised on the assertion that the Plan decided the issues on appeal, once and for all, and that those issues are no longer subject to appellate review because Oglebay allegedly has implemented the restructuring transactions contemplated in the Plan.

The Appellees' basic premise is wrong, as Oglebay's Plan did <u>not</u> decide the issues that are now before the Court in this appeal. Section XI.C. of the Plan does provide, as a general matter, that the Plan and confirmation order serve as a "a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim." (Plan § XI.C.2.) That general statement, however, is expressly qualified by a concluding clause, which states "<u>except as provided in . . . Section XI.C.4.</u>" (*Id.* (emphasis added).)

Section XI.C.4. is a savings clause that, in turn, specifically preserves the Senior Noteholders' right to litigate enforcement of the subordination provisions <u>notwithstanding</u> confirmation and consummation of the Plan:

> <u>Notwithstanding anything to the contrary contained in this
> Section XI.C., any and all rights, arguments and defenses relating
> to the subordination provisions</u> contained in the Old Senior
> Subordinated Note Indenture <u>are expressly preserved</u> solely for the

opinion, and resolution of the appeal would materially advance termination of the litigation.

> holders of [the Senior Notes] . . . and shall be enforced in
> accordance with a <u>Final Order</u>[12] of the Bankruptcy Court resolving
> the parties' respective rights under such subordination provisions.

(Plan § XI.C.4 (emphasis added).)

The effect of this savings clause is self evident. All of the Senior Noteholders' rights in connection with the litigation regarding enforcement of the subordination provisions of the Subordinated Notes "are expressly preserved" notwithstanding the Plan, its confirmation, or its consummation. Those rights are to be determined and enforced pursuant to and "in accordance with" final orders resolving the parties' subordination controversy – i.e., ***the Orders that are now on appeal***. As the Appellees know, this savings clause was included in the Plan specifically at the demand of the Senior Noteholders, as a condition to the Senior Noteholders' withdrawal of objections to Oglebay's proposed Disclosure Statement, and for the express purpose of ensuring that the claims now at issue on appeal would not be foreclosed by the Plan. *See* Section II.D., above.

Indeed, at the time that the savings clause was added to the Plan and Disclosure Statement, Oglebay also amended its Disclosure Statement to address the impact of the litigation that was to be "expressly preserved" by virtue of the savings clause. Specifically, the Disclosure Statement ultimately sent to creditors with the Plan and ballots warned holders of Subordinated Notes that: "A resolution by the Bankruptcy Court [in this litigation] in favor of holders of the Old Senior Secured Notes may dilute

---

[12]    The Plan defines "*Final Order*" as an order or judgment "as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought." (Plan § I.A.40.) Hence, while the Orders subject to this appeal are "final" for purposes of appellate jurisdiction, they are not "Final Orders" within the meaning of the Plan.

-19-

the ultimate recovery of Class 7 Claims under the Plan, which may result in the holders of such Claims [*i.e.*, holders of Subordinated Notes] not receiving the amount of New Common Stock described in the Disclosure Statement." (Disclosure Statement at 27.) The Disclosure Statement in fact warned holders of the Subordinated Notes, <u>in at least three different places</u>, that their "ultimate recovery" could be "dilute[d]" if the Senior Noteholders were to prevail. (*Id.* at 3, 12, 27.) This clearly indicates that the subordination litigation – now before the Court on appeal – was intended to (as it ultimately did) proceed separately and distinctly from litigation regarding confirmation of the Plan, notwithstanding its potential impact on – or "dilution" of – distributions to be made to holders of the Subordinated Notes.[13]

Yet, in the entire 37 pages of their brief, the Appellees devote just two sentences to the dispositive savings clause. (Memo. at 31-32.) They argue, without logic or reason, that the savings clause's reference to a "Final Order of the Bankruptcy Court resolving the parties' respective rights under such subordination provisions" is not a reference to any order or judgment that the Bankruptcy Court would enter in <u>this</u> litigation – which is precisely about "the parties' respective rights under such subordination provisions" – and instead is a reference to the order confirming the Plan. (*Id.*)

This is incredible. If the Appellees were right, the Bankruptcy Court's order confirming the Plan would completely nullify the very rights that the Plan itself "expressly preserves." Section XI.C.4. would be a meaningless nullity, as it would save

---

[13]   Indeed, immediately following the hearing on the Disclosure Statement at which the changes were announced, the Bankruptcy Court held a scheduling conference with respect to this litigation, in which the parties discussed a schedule of dates, deadlines, and procedures that was entirely independent of the schedule established with respect to confirmation of the Plan. (*See* 7/27/04 Transcript at 72-83.)

-20-

and preserve nothing. It is illogical to suggest that the Plan implicitly destroys this litigation, the very thing that the savings clause explicitly purports to preserve.

And, with the backdrop of Section XI.C.4.'s savings clause, it is apparent that each of Appellees' plan-based mootness/*res judicata* arguments is fatally flawed.

### 1. The Case Is Not Constitutionally Moot Because The Court Can Order Effectual Relief.

The Appellees first argue that this appeal is "constitutionally moot" – in other words, that there no longer is any Article III case or controversy to adjudicate – because Oglebay's Plan has been consummated and distributions have been made. (Memo. at 22-27.)

The "party arguing that a case is moot must bear a heavy burden of demonstrating the facts underlying that contention." *Price v. Delaware State Police Federal Credit Union (In re Price)*, 370 F.3d 362, 366 (3d Cir. 2004) (quotation omitted). As the Third Circuit has explained:

> The United States Supreme Court sets a high threshold for judging a case moot. An appeal is moot in the constitutional sense only if events have taken place that make it "impossible for the court to grant any effectual relief whatever." *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992) (citation omitted). An appeal is not moot "merely because a court cannot restore the parties to the *status quo ante* [the state in which it was before]. Rather, when a court can fashion *some* form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." *In re Continental Airlines,* 91 F.3d 553, 558 (3d Cir.1996) (en banc).

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 226 (3d Cir. 2003) (underlining added, italics in original); *accord, e.g.*, *U.S. Trustee v. Official Committee of Equity Security Holders (In re Zenith Electronics Corp.)*, 329 F.3d 338, 340 n.1 (3d Cir. 2003).

The Appellees have not come close to meeting their "heavy burden." The Appellees' protestations notwithstanding, the fact of the matter is that ample meaningful relief is available if this Court ultimately determines that the Bankruptcy Court erred in holding that the "unimpairment" of the Senior Notes enables holders of the Subordinated Notes to receive distributions even though the Senior Noteholders have not received full payment of the acceleration premium and default interest due to them. For example –

- The subordination provisions can and should be enforced through a declaration that, notwithstanding the Plan's "unimpairment," the Subordinated Notes are subordinated to the prior payment in full of all remaining amounts due with respect to the Senior Notes, including the acceleration premium and default interest (which declaration in turn could serve as the basis for an order authorizing recovery of any property, including New Common Stock, wrongfully retained in breach of the subordination provisions).

- The subordination provisions can and should be enforced through an order directing Oglebay and DTC to turnover all New Common Stock that has not yet been irrevocably distributed to holders of the Subordinated Notes.

- To the extent that all New Common Stock has been irrevocably distributed to holders of the Subordinated Notes, or that the New Common Stock that remains in the possession or control of Oglebay and DTC is of a value insufficient to satisfy the remaining amounts due in respect of the Senior Notes, the subordination provisions can and should be enforced through an award of damages from DTC for losses suffered as a result of the wrongful conversion and distribution of property to which the Senior Noteholders are entitled.

-22-

- To the extent that all New Common Stock has been irrevocably distributed to holders of the Subordinated Notes, or that the New Common Stock that remains in the possession or control of Oglebay and DTC is of a value insufficient to satisfy the remaining amounts due in respect of the Senior Notes, the subordination provisions can and should be enforced through an award of damages from the Indenture Trustee for losses suffered as a result of the Indenture Trustee's knowing and willful participation in a violation of the subordination provisions of the Indenture.

The Appellees quibble with the availability of this relief, but the thin evidentiary record they put forth does not support those quibbles. The Appellees, for example, assert that Oglebay transferred the New Common Stock to DTC which then distributed the stock to holders of the Subordinated Notes. (Memo. at 19.) The only evidence offered in support, however, is the Affidavit of Rochelle Walk, who states only that Oglebay "engaged in" the "distribution through the Depository Trust Company of approximately 2,928,571 shares of New Common Stock to the holders of Class 7 Claims (the Old Senior Subordinated Note Claims)" and that "the New Common Stock distributed under the Plan has undergone trading in the over-the-counter market." (Walk Aff. ¶¶ 3, 4.)

Even if Ms. Walk were competent to testify to these facts (and there is no indication that she even has personal knowledge of the facts underlying her testimony), Ms. Walk notably never states: whether DTC has distributed all of the New Common Stock; whether DTC has the right to recover the New Common Stock from the parties to whom it allegedly was distributed (to the contrary, the Appellees elsewhere assert that DTC and the Indenture Trustee would have claims against holders of the Subordinated Notes in the event that the Senior Noteholders are awarded damages, *see* Memo. at 36);

-23-

who has traded the shares and to whom; or how many shares have traded. In short, there is no evidence that DTC could not comply with an order to turnover New Common Stock to the Senior Noteholders.

Moreover, the Senior Noteholders' damages claims against DTC and the Indenture Trustee remain viable even if all of the New Common Stock to be distributed under the Plan in fact has been irrevocably disseminated. The Appellees baldly assert, without citation, that the Senior Noteholders have no contractual, statutory, or legal basis at assert a claim against them. (Memo. at 27.) As the Appellees' own authority demonstrates, that assertion goes to the merits, not to whether or not the Court has jurisdiction to hear this appeal. *Jersey Central Power & Light Co. v. State of New Jersey*, 772 F.2d 35, 41 (3d Cir. 1985) ("Damages should be denied on the merits, not on the grounds of mootness."); *accord, e.g.*, *Donovan v. Punxsutawney Area School Board*, 336 F.3d 211, 218 (3d Cir. 2003). The Appellees also are wrong – there exists ample grounds to recover damages for breach of contract and wrongful conversion and distribution of property that, as the Appellees were on notice, belonged to the Senior Noteholders.[14]

The Appellees further claim that the Plan completely immunizes DTC. (Memo. at 27.) However, the limited release in the Plan is only for actions taken "in accordance with the terms of the Plan." (Plan § VI.D.1.b.v.) As noted, the Plan itself "expressly

---

[14]    If need be, the Senior Noteholders can amend their damage claims to reflect the subsequent facts relating to confirmation and distributions made under the Plan. In any event, damages or other monetary relief can be awarded so long as the Senior Noteholders prove the facts that entitle them to relief, regardless of whether their Complaint specifically requests damages relating to those facts. Fed. R. Bankr P. 7054 (incorporating Rule 54(c) of the Federal Rules of Civil Procedure) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings"); *Coltec Industries, Inc. v. Hobgood*, 280 F.3d 262, 277 (3d Cir. 2002) (damages available even when not requested in complaint).

preserves" the subordination rights of the Senior Noteholders that are at issue in this appeal, and DTC unquestionably was on notice of those rights (it was, in fact, a defendant in the litigation that the Senior Noteholders commenced to enforce those rights). In any event, DTC was not sued in connection with anything it did or did not do under the Plan. It was sued before the Plan was voted on, confirmed, or implemented, and it was sued in its capacity as the sole record holder of the Subordinated Notes and in order to enforce the private third party rights held by the Senior Noteholders. The Plan never authorized DTC to do anything free and clear of those third party rights, which were "expressly preserved" in the Plan itself.

As the Appellees' own authority again demonstrates, "the availability of damages or other monetary relief almost always avoids mootness." *Jersey Central*, 772 F.2d at 41; *accord, e.g.*, *Donovan*, 336 F.3d at 218. Here, the Senior Noteholders' damage claims are alive and well, and this appeal therefore clearly presents a case in which the Court can order "<u>some</u> form of meaningful relief." As a consequence, there remains a "case or controversy" among the parties and this appeal is not moot.

## 2. The Case Is Not Equitably Moot Because The Relief Sought By The Senior Noteholders Would Not Require Undoing Oglebay's Reorganization.

The Appellees also contend that the Court should dismiss this appeal under a doctrine that has become known as "equitable mootness." (Memo. at 34-37.) This argument also misses the mark.

Equitable mootness is a judge-made doctrine that arose, unlike this case, in the context of appeals of plan confirmation orders. The doctrine relieves appellate courts of having to attempt the impossible – overturning a complex bankruptcy reorganization that has been implemented by the time that an appeal of plan-related matters is to be

adjudicated. Equitable mootness applies if, and only if, a reversal on appeal would require parties to unravel consummated reorganization transactions and it would be inequitable and/or impossible to do so. As the Third Circuit recently has explained, other "equitable considerations" are irrelevant to the analysis:

> It is a general rule that when a court has jurisdiction to hear an appeal, it has a "virtually unflagging obligation" to exercise that jurisdiction. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976); *see also Continental I,* 91 F.3d at 568 (Alito, J., dissenting). The doctrine of equitable mootness carves out an exception to this general rule, but it is a very limited and well-defined exception. The doctrine has been carefully developed to <u>apply only in that rare situation in which a successful appeal would undo a complicated plan of reorganization</u>. It would make little sense, in light of this carefully considered doctrine, and in light of our "virtually unflagging obligation" to exercise our jurisdiction, to allow courts to dismiss appeals on the basis of an ad hoc weighing of the equities of a successful appeal.

*Zenith Electronics*, 329 F.3d at 347 (emphasis added).

Equitable mootness therefore is shorthand for "a court's decision that the *fait accompli* of a plan confirmation should preclude further judicial proceedings." *Id.* at 343 (quotations omitted). It is a doctrine that "is limited in scope and must be cautiously applied." *Id.* (quotations omitted). In that cautious application, courts consider five factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Id.* (quotations omitted).

The Appellees argue that, in this analysis, "the foremost consideration is whether the Plan has been substantially consummated." (Memo. at 35.) The Third Circuit,

however, has warned that the equitable mootness analysis "does not merely entail a formalistic inquiry into whether the plan has been substantially consummated." *Zenith Electronics*, 329 F.3d at 343-44; *see* 7 *Collier on Bankruptcy* ¶ 1101.02[1][c] (15th ed. rev. 2005) ("Parties who are opposing the appeal of a confirmation order often claim that the appeal is moot because the plan has been substantially consummated. . . . Such an argument is a misplaced reliance on the concept of substantial consummation. The term was included in the Code for a much more limited purpose and is not applicable in determining whether an appeal is moot.").

To the contrary, "the critical question under the first factor is whether, if successful, the appeal might unravel the reorganization plan." *Zenith Electronics*, 329 F.3d at 346; *see United Artists*, 315 F.3d at 228 (no equitable mootness where relief sought would "not entail 'knocking [out] the props' under the Plan"); *In re PWS Holdings Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (no equitable mootness where relief sought would not "necessitate the reversal or unraveling of the entire plan of reorganization").

Here, the Appellees do not even try to argue that the relief sought on appeal would undo Oglebay's reorganization. To the contrary, as demonstrated by the savings clause included in the Plan, this litigation involves nothing more than a dispute between two competing groups of creditors as to certain property distributed under Oglebay's Plan (and possibly the wrongful distribution of that property following Plan confirmation). As evidenced by the fact that they did not even appeal the Bankruptcy Court's confirmation order, the Senior Noteholders do not seek to unwind Oglebay's reorganization. All they want to do is enforce their rights under the subordination provisions of the Indenture by recovering property (or its monetary equivalent) improperly distributed to creditors who

agreed to be subordinate to holders of the Senior Notes and who, in this litigation and in the Disclosure Statement, were on notice and warned that the Senior Noteholders asserted a senior interest in that property.

This case therefore is like the many other cases involving ancillary issues that the Third Circuit has determined not to be subject to the doctrine of equitable mootness notwithstanding the substantial consummation of the plan at issue. *See, e.g., Zenith Electronics*, 329 F.3d at 343-47 (District Court abused its discretion in dismissing an appeal of a professional fee award as equitably moot, where relief sought would not unravel the plan); *United Artists*, 315 F.3d at 228 (appeal of a professional retention not equitably moot where relief sought "does not entail 'knocking [out] the props' under the Plan"); *PWS Holding*, 228 F.3d at 236-37 (appeal of releases given under a plan not equitably moot where "the plan could go forward" even in the event of a reversal); *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 210 (3d Cir. 2000) (appeal of releases given under a plan not equitably moot where "[n]o evidence or arguments have been presented that Plaintiffs' appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization").

To the extent they are relevant, the other "equitable mootness" factors do not call for dismissal of this appeal. For example, there was no reason for the Senior Noteholders to seek a stay of the plan confirmation order because they were not appealing that order and, pursuant to the savings clause, the Plan itself fully preserved all of the Senior Noteholders' rights and claims in this litigation. Similarly, all of the necessary parties are involved in this litigation and are before the Court. In particular, DTC is the holder of record of the Subordinated Notes and fully controls (or controlled) the disposition of New Common Stock. And, there is no overarching policy of finality in bankruptcy that

trumps a litigant's right to appeal final judgments entered in an adversary proceeding relating to the rights of certain creditors vis-à-vis others.

As the Third Circuit has explained, "the underlying purpose of the equitable mootness doctrine . . . [is] to prevent a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *Zenith Electronics*, 329 F.2d at 347 (quotations omitted). Here, the Senior Noteholders do not seek to "unscramble" Oglebay's reorganization, and they acted to preserve of all their rights well before the Plan was confirmed (or even voted on) by commencing this case and then negotiating for the Plan's savings clause to preserve the claims they asserted. In short, the Senior Noteholders had no reason to proceed other than as they have, through an appeal of the Orders now before the Court. As a consequence, the equitable mootness doctrine has no applicability to this appeal.

### 3. The Confirmation Order Is Not Preclusive Because The Plan Preserved, Rather Than Adjudicated, The Controversies At Issue On Appeal.

The Appellees further contend that this appeal is "doomed" because of "the preclusive effect of the Confirmation Order." (Memo. at 27.) As an initial matter, this is a contention that goes to interpretation of the Oglebay Plan and must be presented, in the first instance, to the Bankruptcy Court – the court that approved the Plan and entered the confirmation order. *See, e.g., Johns-Manville Corp. v. Colorado Insurance Guaranty Ass'n (In re Johns-Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) ("the question of interpretation of the administration of the plan belonged in the bankruptcy court"); *Resorts Int'l Financing, Inc. v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004) ("where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation,

implementation, consummation, execution, or administration of a confirmed plan or

incorporated litigation trust agreement, retention of post-confirmation bankruptcy court

jurisdiction is normally appropriate"). The Plan itself provides for the Bankruptcy Court

to retain jurisdiction to "[r]esolve any cases, controversies, suits or disputes that may

arise in connection with the consummation, interpretation or enforcement of the Plan . . .

or any entity's rights arising from or obligations incurred in connection with the Plan."

(Plan § XII(7).) A question of interpretation of the Plan, never presented to or

adjudicated by the Bankruptcy Court, is not appropriate for summary review by an

appellate court in the context of a motion to dismiss.

More fundamentally, the Oglebay Plan and confirmation order simply cannot

have any preclusive effect (whether as to claims or issues) with respect to this appeal.

Here again, the basic principle of law is not controversial. "[A] confirmation order

constitutes a final judgment on the merits with respect to the issues addressed in the plan

of reorganization." *In re EXDS, Inc.*, 316 B.R. 817, 822 (Bankr. D. Del. 2004). It is

equally clear, however, that "the scope of [the] preclusive effect [of a confirmation order]

is limited by the content of the reorganization plan and the confirmation order." *Maxwell*

*Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93

F.3d 1036, 1044-45 (2d Cir. 1996); *accord, e.g., Eastern Air Lines, Inc. v. Brown &*

*Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.)*, 262 B.R. 604, 612 (Bankr.

S.D.N.Y. 2001).

Here, by virtue of savings clause in Section XI.C.4., the Oglebay Plan "expressly

preserved" the rights and claims that are at issue in this case. Thus, there was no

adjudication of those issues by the confirmation order. To the contrary, the confirmation

order approved "the Plan and each of its provisions," (*see* Reinthaler Aff., Ex. EE, at 14),

including the express reservation of the Senior Noteholders' rights in this litigation. As a consequence, the confirmation order has no preclusive effect with respect to this appeal. *See Venuto v. Witco Corp.*, 117 F.3d 754, 759 n.8 (3d Cir. 1997) ("A judgment that expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action that was advanced in the first action should be effective to forestall preclusion.") (quotations omitted); *Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines*, 296 F.3d 624, 629 (7th Cir. 2002) ("under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action"); *see also Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289-90 (11th Cir. 2004) (in the case of a consent decree or stipulated order, "the preclusive effect of the earlier judgment is determined by the intent of the parties") (quotation omitted).

The Appellees' contention that the matters at issue in this appeal "were actually and necessarily litigated and decided against [the Senior Noteholders] by the Bankruptcy Court in confirming the Plan," (Memo. at 28), is dead wrong and completely contradicts the Plan's savings clause. For one thing, the confirmation order contains no findings of fact, no conclusions of law, and no mention whatsoever of the Senior Noteholders or their claims, rights, and arguments. The confirmation order merely contains a general statement that any objections filed with respect to the Plan are overruled. (Reinthaler Aff., Ex. EE, at 14.)

The record of the confirmation hearing provides no substantive elaboration. The Bankruptcy Court stated only that the Senior Noteholders' objections to the Plan were overruled "for the reasons set forth" in the Bankruptcy Court's opinion regarding

-31-

subordination – the very order that is now on appeal in this case – which had been issued

several days <u>before</u> the confirmation hearing. (Reinthaler Aff., Ex. AA, at 109-10.)

Moreover, while related to the issue now on appeal in this case, the Senior

Noteholders' objection to confirmation of Oglebay's Plan was different and distinct from

the issues that this Court will be called upon to decide in this appeal. As explained

above, by the time of the confirmation hearing the Bankruptcy Court had already ruled in

favor of the Appellees and against the Senior Noteholders in the subordination litigation.

As a consequence, at confirmation, the Senior Noteholders only argued that,

notwithstanding the Plan's designation of the Senior Notes as "unimpaired," the

treatment of the Senior Notes under the Plan in fact rendered the Senior Notes impaired

as a matter of law and that, as a result, the Plan could not be confirmed because the votes

of the Senior Noteholders had not been solicited. (Brodnicki Aff., Ex. E, at 73-75.) In

contrast, the issue in this appeal is whether, in light of the unimpairment under the Plan –

which, pursuant to the Bankruptcy Code, must leave intact all of "the legal, equitable, or

contractual rights" of the holders of the Senior Notes – the Senior Noteholders are

entitled to recover the additional amounts due with respect to the Senior Notes from the

distributions to be made (or made) in respect of the Subordinated Notes.[15]

---

[15]   This case therefore bears little resemblance to the Appellees' primary case,
*Corestates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187 (3d Cir. 1999). In
*Corestates*, there was nothing in the plan like the savings clause here, nothing that
preserved the claimant's right to pursue its subordination claim following
confirmation, and the claimant was not left "unimpaired" by the plan. Thus, because
the claimant's plan objection "effectively raised and litigated" the subordination
issue, the Court held that the confirmation order precluded the claimant's subsequent
litigation. *Id.* at 194. Here, the Senior Noteholders' Plan objection did not
"effectively raise and litigate" the issue now on appeal (which had been decided days
earlier by the Bankruptcy Court in the adversary proceeding from which this appeal
has been taken) and, in any event, the Plan (and therefore the confirmation order)

Because the Senior Noteholders' rights with respect to the latter issue were preserved by the savings clause, the Senior Noteholders chose not to appeal the confirmation order and to focus their efforts on this appeal. Nothing in the Plan or confirmation order precludes this appeal from going forward.

**4.      The Senior Noteholders Do Not Seek To Modify Oglebay's Plan.**

Finally, the Appellees argue that the Senior Noteholders seek an impermissible modification of Oglebay's Plan. (Memo. at 32-34.) However, none of the relief requested by the Senior Noteholders requires a modification of the Plan. To the contrary, as demonstrated above, the Plan contemplates this very litigation, and this litigation serves to enforce the provisions of the Plan. Moreover, Oglebay even anticipated what would happen in the event that the Senior Noteholders were to prevail in enforcing the subordination provisions, as Oglebay explained in its Disclosure Statement with respect to the Plan that holders of the Subordinated Notes would "not receiv[e] the amount of New Common Stock described in the Disclosure Statement" if the Senior Noteholders succeeded in establishing their claims in this case.

Thus, nothing in sections 1127, 1129, or 1144 of the Bankruptcy Code even remotely precludes this appeal.

---

"expressly preserved" the Senior Noteholders' rights to pursue this litigation and appeal.

## IV.    CONCLUSION

The Oglebay Plan specifically preserves the Senior Noteholders' rights as to the

matters implicated by this appeal.  The Senior Noteholders request that the Court deny

the motion to dismiss and proceed to hear and determine the merits of this appeal.

/s/ Brian A. Sullivan
Brian A. Sullivan   (I.D. No. 2098)
Amy D. Brown      (I.D. No. 4077)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
P. O. Box 25046
Wilmington, Delaware   19899
Tel.: (302) 652-1100
Fax: (302) 652-1111

-and-

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
601 South Figueroa Street, Ste. 3300
Los Angeles, California  90017
Tel.: (213) 694-1200
Fax.: (213) 694-1234

A. Brent Truitt
245 Park Avenue, Ste. 3962
New York, New York  10167
Tel.: (212) 672-1966
Fax.: (212) 672-1965

*Attorneys for MW Post Portfolio Fund Ltd.,
et al., Appellants*

472563\w7