# EXHIBIT C



FILED

2004 AUG -9 AM 10:02

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                           .        Chapter 11

ONCO Investment Company,         .
et al.,                          .

          Debtor(s).             .        Bankruptcy #04-10558 (JBR)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                        Wilmington, DE
                        July 27, 2004
                          9:30 a.m.

                TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE JOEL B. ROSENTHAL
              UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):          Michelle M. Harner, Esq.
                            Jones Day
                            North Point
                            901 Lakeside Ave.
                            Cleveland, OH 44114

                            Carl E. Black, Esq.
                            Jones Day
                            North Point
                            901 Lakeside Ave.
                            Cleveland, OH 44114

                            David G. Heiman, Esq.
                            Jones Day
                            North Point
                            901 Lakeside Ave.
                            Cleveland, OH 44114

                            Daniel J. DeFranceschi, Esq.
                            Richards Layton & Finger, PA
                            One Rodney Square
                            Wilmington, DE 19899



Exhibit C

| | | |
|---|---|---|
| 1 | For Official Committee of: | Christopher R. Donoho, III, Esq. |
| 2 | Unsecured Creditors | Stroock Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |
| 3 | | |
| 4 | | Wendell Adair, Esq.<br>Stroock Stroock & Lavan, LLP |
| 5 | | 180 Maiden Lane<br>New York, NY 10038 |
| 6 | | Kenneth Pasquale, Esq.<br>Stroock Stroock & Lavan, LLP |
| 7 | | 180 Maiden Lane<br>New York, NY 10038 |
| 8 | | |
| 9 | | Michael Busenkell, Esq.<br>Morris Nichols Arsht |
| 10 | | & Tunnell<br>1201 N. Market Street<br>Wilmington, DE 19899 |
| 11 | | |
| 12 | For Ad Hoc Committee of::<br>Senior Secured Noteholders | Bruce Bennett, Esq.<br>Hennigan Bennett & Dorman, LLP |
| 13 | | Ste. 3300<br>601 South Figueroa Street<br>Los Angeles, CA 90017 |
| 14 | | |
| 15 | | A. Brent Truitt, Esq.<br>Hennigan Bennett & Dorman, LLP |
| 16 | | Ste. 3300<br>601 South Figueroa Street<br>Los Angeles, CA 90017 |
| 17 | | |
| 18 | | David Fournier, Esq.<br>Pepper Hamilton, LLP |
| 19 | | Hercules Plaza<br>1313 Market Street-Ste. 5100<br>Wilmington, DE 19899 |
| 20 | For Federal Insurance: | Jeffrey R. Waxman, Esq. |
| 21 | | Cozen O'Connor<br>Chase Manhattan Centre |
| 22 | | 1201 N. Market street-Ste. 1400<br>Wilmington, DE 19801 |
| 23 | | |
| 24 | | |
| 25 | | |

**Exhibit C**

| | | |
|---|---|---|
| 1 | For Wells Fargo as: | William P. Weintraub, Esq. |
| | Indentured Trustee: | Pachulski Stang Ziehl Young |
| 2 | | Jones & Weintraub, PC |
| | | 780 Third Ave.-36th Fl. |
| 3 | | New York, NY 10017 |
| 4 | For GECC: | Dennis A. Meloro, Esq. |
| | | Greenberg Traurig, LLP |
| 5 | | The Brandywine Bldg. |
| | | 1000 West Street-Ste. 1540 |
| 6 | | Wilmington, DE 19801 |
| 7 | For Shareholder Group: | Harry W. Greenfield, Esq. |
| | | Buckley King, PA |
| 8 | | 1400 Bank One Center |
| | | Cleveland, OH 44114 |
| 9 | | |
| | For NuFleet, LLC and Capital: | Thomas W. Coffey, Esq. |
| 10 | Works, LLC | Tucker Ellis & West, LLP |
| | | 1150 Huntington Blvd. |
| 11 | | 925 Euclid Ave. |
| | | Cleveland, OH 44115 |
| 12 | | |
| | | Scott Kelly, Esq. |
| 13 | | Tucker Ellis & West, LLP |
| | | 1150 Huntington Blvd. |
| 14 | | 925 Euclid Ave. |
| | | Cleveland, OH 44115 |
| 15 | | |
| | For Cook County Asbestos: | Joseph Frank, Esq. |
| 16 | Claimants | Neal Gerber & Eisenberg, LLP |
| | | Ste. 2200 |
| 17 | | Two North LaSalle Street |
| | | Chicago, IL 60602 |
| 18 | | |
| | For Asbestos Tort Claimants: | Marla R. Eskin, Esq. |
| 19 | | Campbell & Levine, LLC |
| | | 800 N. King Street-Ste. 300 |
| 20 | | Wilmington, DE 19801 |
| 21 | For Acting U.S. Trustee: | Margaret Harrison, Esq. |
| | (Roberta A. DeAngelis) | U.S. Trustee's Office |
| 22 | | 844 King Street-Ste. 2313 |
| | | Lock Box 35 |
| 23 | | Wilmington, DE 19801 |
| 24 | | |
| 25 | | |

Exhibit C

4

| | | |
|---|---|---|
| 1 | Audio Operator: | Brandon J. McCarthy |
| 2 | Transcribing Firm: | Writer's Cramp, Inc. |
| 3 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| | | 732-329-0191 |

4
5  Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Exhibit C

5

THE CLERK:  All rise.  The United States Bankruptcy Court for the District of Delaware is now in session, the Honorable Joel B. Rosenthal presiding.

(Pause in proceedings)

THE COURT:  Don't be shy.

MS. HARNER:  Good morning, Your Honor, Michelle Morgan Harner of Jones Day on behalf of the Debtors and Debtors-In-Possession.  Your Honor, I believe that the three matters before the Court this morning are the motions of Debtors to extend exclusive periods, which no objections were filed, and to which we filed a Certificate of No Objection.  But I do not believe an Order has yet been entered.

THE COURT:  No, I thought we'd wait and see where we went on these other matters before I dealt with that one.

MS. HARNER:  That's just fine, Your Honor.  The second matter we have is the Debtor's Disclosure Statement and request for approval of the Disclosure Statement in accordance with Section 1125 of the Bankruptcy Code.  There have been several objections filed.  We have been working diligently to try to resolve some of those objections.  My colleague, Mr. Heiman, will provide you an overview of the status, and I will then provide you further detail, Your Honor.  The remaining matter on the hearing agenda is the status conference in the adversary proceeding that has been filed by certain holders of the Senior Secured Noteholders against the Indentured Trustee of the

EXHIBIT C

6

1   General Unsecured Bonds and the Debtors.  And we would propose

2   to handle that status conference after the other matters on the

3   agenda.

4          THE COURT:  Fine.

5          MS. HARNER:  Thank you, Your Honor.

6          THE COURT:  Mr. Heiman.

7          MR. HEIMAN:  Good morning, Your Honor, thank you,

8   David Heiman, Jones Day on behalf of the Debtors.  And we are,

9   Your Honor, very pleased to be here today in what we think is a

10  very, very important step in our Chapter 11 process.  As Ms.

11  Morgan Harner has said, she will cover the modifications to the

12  Disclosure Statement that were necessary to address some of the

13  objections and concerns, as well as to update financials.  She

14  will also cover our response to specific objections.  What I

15  would like to do, if I may, is give a brief context for Your

16  Honor to consider the adequacy of disclosure.  And of course we

17  believe that what we have submitted to the Court and the

18  parties is more than adequate under 1125, and hopefully we'll

19  be able to persuade Your Honor to enable us to embark on the

20  confirmation process that we seek to conclude within the near

21  term.

22      In terms of the objections that remain, I am pleased to

23  advise Your Honor that we have dealt with most of the

24  objections and concerns that have been presented to us.  The

25  remaining objections are from certain shareholders who, as Your

Exhibit C

er

1   Honor knows, are not participants under the Plan of

2   Reorganization, there being insufficient value to provide them

3   with any recovery, and therefore a group that has been deemed

4   under our Plan to vote no, and certain putative purchasers who

5   we believe are attempting to slow the process down a bit so

6   they can deal with us on a potential acquisition of the assets

7   of the Oglebay Norton operations.  And on that we are meeting

8   with these purchasers and their counterparts to address their

9   issues this week.

10       The context is essentially five months ago we appeared

11  before you for the first time.  We advised you at that time of

12  what we thought was a very viable yet optimistic program that

13  would help us speed our way through the bankruptcy process so

14  that there would be little, if any, damage to the Estate and

15  the businesses, and the Creditors would be able to receive

16  their recoveries as quickly as possible.  And we said

17  optimistically that we hoped that we would be able to seek a

18  confirmation hearing within six months of the filing.  And as

19  we stand before you today we are on schedule.  There have been

20  many challenges in realizing the events of today.  I don't want

21  to belabor those unless Your Honor has any wish to go through

22  what they are.  But I will say this about the Plan that we

23  propose.  It is a Plan based on a good deal of work pre-

24  petition, as Your Honor knows.  It is a Plan based on a good

25  deal of work post-petition in order to resolve, as the arose,

**Exhibit C**

1    some very thorny issues.  The result is an agreement with the

2    Noteholders.  The Noteholders are represented today by the

3    Creditor's Committee who obviously represent all Unsecured

4    Creditors.  And the Noteholders have agreed, or will agree when

5    they sign their ballots, to accept stock in exchange for their

6    debt.  Certain Noteholders have also agreed and made a

7    commitment to the company that they will purchase preferred

8    shares, and raise sufficient capital through that financing to

9    pay in full the mezzanine Noteholders.  And I'll discuss where

10   the mezzanine Noteholders stand in a brief moment.

11        The company also was able to obtain sufficient post-

12   petition financing to pay in full the pre-petition Senior

13   Secured Creditors.  That was an event I hadn't experienced in

14   any of my Chapter 11's, so I think it demonstrates some

15   creative thinking and a lot of hard work.  And so that entire

16   constituency is removed from these proceedings at this point.

17   That was $240,000,000 approximately that was paid off.  We also

18   reached agreement with the MLO obligees, and reached new terms

19   that are satisfactory to the Noteholders, as well as the MLO.

20   And as a result of all of that, we have achieved a new capital

21   structure that will make this company stronger and more viable

22   for the long term.  In achieving that new capital structure we

23   eliminated, or will eliminate on the effective date, in excess

24   of $180,000,000 of debt.  And all of this, by the way, Your

25   Honor, was done while the business continued to operate,

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

Exhibit C

1   operate well, in fact met or exceeded its budget.  And so the

2   game plan of moving through this proceeding swiftly so that

3   there would be no damage to the business has thus far been

4   successful.

5       In terms of the objections that Ms. Morgan Harner or the

6   objectors will present to you, Your Honor, first let me deal

7   with the mezzanine Noteholders.  We believe at this juncture

8   that we have satisfied the mezzanine Noteholders' objections,

9   subject to maybe a little bit of language tweaking.  But we

10  believe that we have addressed all of their objections.  They

11  have continuing concerns in the case that Mr. Bennett will

12  address to you in due course.  Those concerns relate to

13  subordination provisions and the like which we believe will

14  have to be determined by the Court at some point after today.

15  But as of today they, I believe, are not a continuing objector

16  to approval of the Disclosure Statement.  The shareholders that

17  filed the objection are here today, and will be submitting or

18  presenting their objections.  As I said, they are unhappy,

19  understandably so.  We're not happy that we have not been able

20  to provide value to them, but the numbers are what they are.

21  We do not have sufficient value.  The noteholders are taking

22  substantially less than 100 cents on the dollar, and there's

23  just no value there for the shareholders.  So they are deemed

24  under our Plan to vote no because they get no recovery.  And

25  accordingly, it is our view that their objection is not

**Exhibit C**

1   relevant.

2   And with respect to the putative purchasers, Ms. Morgan

3   Harner will address that as well.  But we believe the bases for

4   their objections are born of the desire to try to slow the

5   process down so they can attempt to provide perhaps terms and

6   conditions that might be acceptable to the noteholders and the

7   company for a 363 sale.  We are not precluding that option.

8   However, at this juncture we believe there are many, many

9   issues, including a purchase price, that stand in the way of

10  such a transaction.  With that, Your Honor, I'll turn it over

11  to Ms. Morgan Harner.  Thank you.

12          THE COURT:  Thank you.

13          MS. HARNER:  Thank you, Your Honor.  Before getting

14  into the objections that were filed to the Disclosure

15  Statement, I would like to briefly summarize for the Court the

16  modifications that the Debtors made to the Disclosure Statement

17  to, among other things, address some of the issues raised by

18  the objecting parties.  I would note, Your Honor, that the

19  Debtors firmly believe that the Disclosure Statement filed on

20  July 1st contained adequate information and fully complied with

21  Section 1125 of the Bankruptcy Code.  Nevertheless, in an

22  effort to provide as much information as possible, and as I

23  said to address some of the issues raised by the objecting

24  parties, we have made certain modifications.  And those were

25  reflected in clean and blacklined copies of the Plan and

Exhibit C

1 Disclosure Statement filed this past Friday, July 23rd. And,

2 Your Honor, I do apologize for the lateness of the filing. We

3 just are continuing to resolve, and trying to resolve as many

4 open issues as we can. Looking at the blackline, Your Honor --

5 THE COURT: Are you referring to the Second Amended --

6 MS. HARNER: Yes. And I'm going to give you page

7 numbers, Your Honor --

8 THE COURT: Okay.

9 MS. HARNER: -- in the blackline. It's the easiest, I

10 think, to review.

11 THE COURT: It's the only one I -- they don't let me -

12 - they don't give me the clean one.

13 MS. HARNER: Very good. It's the most convenient way.

14 Looking first, Your Honor, at page 26 of the blackline of the

15 Disclosure Statement, the Debtors have added additional

16 information regarding the current dispute with the holders of

17 Class 3 claims, which are senior secured notes, and have also

18 indicated the revised treatment for that Class, which is

19 reinstatement. I believe there are some remaining open issues

20 with respect to this disclosure that I will address in a

21 minute. But with respect to explaining the dispute between the

22 parties, and the proposed treatment, we believe that this

23 disclosure addresses that concern raised by the Ad Hoc

24 Committee of Noteholders in its objection.

25 The next additional will be found on page 28 of the

EXHIBIT C

12

1   blackline.  And it explains the contract by which the Debtors

2   purchased the partnership interest of the Michigan Limestone

3   Operations, more often referred to as the MLO contract, and the

4   amendment that the Debtors propose to make to that contract in

5   connection with its assumption under the Plan.  We believe that

6   addresses concerns raised by both the objecting shareholders

7   and the putative purchasers in their objections.  The next

8   change can be found on page 29.  And it relates to additional

9   disclosures regarding the Debtor's alleged asbestos and silica

10  product liability claims, as well as related insurance, the

11  extent of that insurance coverage, and our current discussions

12  with certain holders of those claims.  We believe that this

13  additional information addresses certain issues raised by the

14  objecting shareholders and the putative purchasers.

15      The next disclosure can be found on page 43.  And it

16  relates, Your Honor, to the expression of interests that we've

17  received from what we're calling the Consortium or the putative

18  purchasers, which include the objecting parties New Fleet, LLC

19  and Capital Works, LLC.  We don't believe, Your Honor, that

20  this disclosure is required by 1125 which specifically says you

21  don't have to disclose alternatives to the Plan.  But

22  nevertheless in an effort to provide as much information as

23  possible and address concerns raised by the shareholders and

24  the potential purchasers, we've included this information.

25      The next change is on page 86 of the Disclosure Statement,

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

Exhibit C

1 and it relates to additional information concerning the

2 management agreements that have been negotiated with the

3 Creditor's Committee for certain members of management.  Your

4 Honor, I would note that this additional information is being

5 provided not only to address some of the issues raised in the

6 objections, but because we were just able to finalize the terms

7 of these agreements so that this is fresh and new information,

8 and we wanted to provide as much information as possible.

9 Similarly on the next page, page 87, we've provided additional

10 information regarding the final terms negotiated with the

11 Committee on the management stock plan and the management

12 incentive plan.  Again there was some suggestion in the

13 objecting papers that not enough information was provided on

14 these agreements.  We have now provided disclosure of all

15 material and economic terms that will be implemented in

16 connection with these new plans and agreements.

17        The next substantive change, Your Honor, can be found on

18 page 125.  And this is actually a deletion that we've made to

19 the Plan of Reorganization.  It was Section 11(b)(3) in the

20 Plan of Reorganization, which was entitled, "Consent to

21 Injunctions."  And the United States Trustee's Office asked us

22 to take a look at that provision, and delete it.  And we

23 conceded to that request, and have deleted it from the Plan.

24 The next change, Your Honor, is on page 127, which is just an

25 additional disclosure regarding the release provisions provided

EXHIBIT C

1  under the Plan, asserting the Debtor's position that we believe

2  these releases fully comply with applicable 3rd Circuit and

3  Delaware law, and that we fully intend to make an appropriate

4  record at the confirmation hearing to support those releases.

5  In addition, Your Honor, both the Plan and Disclosure Statement

6  that were filed on Friday reflect additional changes that

7  basically are either updated information or the resolution of

8  minor issues that were outstanding with the Committee or other

9  Parties-In-Interest.  But the ones we just reviewed we believe

10  address all of the disclosure concerns raised by the objecting

11  parties.  In addition, Your Honor, since Friday the company has

12  been diligently working to update the financial information

13  provided in the Disclosure Statement, including the projections

14  and the valuations, to account for an October emergence, and

15  the terms of the Debtor's revised business plan.  I have a copy

16  of those revised projections with me, Your Honor.  And I would

17  emphasize that they don't change the nature of the information

18  being disclosed.  We are still disclosing the same type of

19  information, extent of information, and scope of information.

20  We've simply updated the numbers.  And I do have that available

21  for the Court and any Party-In-Interest that would like to see

22  the new numbers that we intend to include in any Disclosure

23  Statement approved by the Court.

24     Second, Your Honor, we have been continuing to work with

25  the Committee on one remaining open issue that we had with the

Exhibit C

1  Committee.  And that's with respect to whether or not a

2  shareholder's rights plan will be implemented in connection

3  with the Plan.  The shareholder's rights plan being discussed

4  right now would include a standard poison pill, and perhaps a

5  change of control purchase put.  We still are in discussions

6  with the Committee.  We have not been able to finalize whether

7  such a shareholder's rights agreement will be implemented, or

8  whether the terms will be both a poison pill or the put.  And

9  so what we intend to do, Your Honor, is to fully disclose those

10  discussions with the Committee in the Plan -- and I have a

11  proposed insert for that as well if anyone would like to see it

12  -- and then to commit in the Disclosure Statement to providing

13  a detailed term sheet and/or the actual shareholder's rights

14  plan as an exhibit to the Plan of Reorganization that would be

15  filed as soon as possible, but in any event no later than 10

16  days before the objection deadline.

17          THE COURT:  Well let's go over it right nos.

18          MS. HARNER:  Okay.

19          THE COURT:  You've got several documents that are

20  listed here which you're proposing would be made available no

21  later than 10 days before confirmation.

22          MS. HARNER:  Yes, Your Honor.

23          THE COURT:  So you expect people to vote before the

24  documents are available.

25          MS. HARNER:  Actually --

Exhibit C

16

1    THE COURT: I've got a serious problem with that. If

2  they're important enough to be disclosed to people, they're

3  important enough to be disclosed as part of the disclosure. I

4  think it's unfair to send people 160 or 180 or 200 pages of

5  documents and then say, "Read this now, but don't vote, because

6  there's more coming." And then you're going to go through

7  another mailing. And I just -- I don't see it. I don't know

8  why you have to wait.

9    MS. HARNER: Your Honor, we're obviously happy to do

10  whatever the Court's preference is on this issue.

11    THE COURT: Well, I'm willing to listen, but I just --

12  I mean I haven't heard any reason, nor is there any good reason

13  set forth in any of these papers to say why they're not going

14  out at the same time.

15    MS. HARNER: Our basic reason, Your Honor, is we

16  believe that we have disclosed all the material economic terms

17  of those agreements. And because of the volume of paper that

18  would be associated with actually serving all the agreements we

19  had planned to attach as exhibits to the Plan, we tried to

20  describe them in as much detail as possible to give the parties

21  the relevant summaries to base their decisions on. And then I

22  believe what the Plan says is that the actual agreements, or

23  detailed term sheets, as applicable, would be made available by

24  a filing with the Court and through our document website so

25  that if parties felt they wanted to see --

Exhibit C

1    THE COURT:  That's fine.  But why do -- I don't care

2  if you don't send out an extra 10 pounds of paper.

3    MS. HARNER:  Okay.

4    THE COURT:  It's a question of when they're going to

5  be available.

6    MS. HARNER:  We will make them available, Your Honor,

7  as soon as possible.  The Debtors do not believe they'll

8  contain any information different, or substantially different

9  from what's in the Disclosure Statement on those agreements.

10 We certainly can commit to file them as soon as possible.  And

11 that would be our intent.  We're simply trying to keep the

12 process moving, and insure that the Debtors, the Committee, and

13 the Exit Lenders have sufficient time to document and

14 memorialize those agreements.

15    THE COURT:  Well, we'll talk about that as we move

16 along.  Go ahead.

17    MS. HARNER:  Okay.  The third issue we've been working

18 to resolve, Your Honor, as Mr. Heiman referenced, was issues

19 raised by the Senior Secured Noteholders.  And basically where

20 we are, Your Honor, is I think the Secured Noteholders would

21 like additional disclosures in the Disclosure Statement

22 regarding their position that reinstatement does not take into

23 account and resolve their concerns regarding their

24 subordination rights against the Unsecured Bondholders.  And we

25 are happy to provide whatever additional disclosure in that

Exhibit C

1   respect we can.  We have proposed to add additional language

2   regarding the Noteholders' position, the Committee's and the

3   Debtor's position, which is that reinstatement reinstates the

4   contract at original maturity.  And while it doesn't extinguish

5   the subordination rights, there no longer are subordination

6   rights available, because the section of the indenture being

7   relied upon by the Noteholders, Section 1102, is only

8   applicable in a bankruptcy or insolvency situation.  And we

9   believe that the reinstatement cures that trigger.  So we would

10  provide full disclosure of the respective provisions, also

11  provide the disclosure to the holders of the Unsecured Bonds

12  that their recovery could be diluted if the Court agrees with

13  the Noteholders regarding the effect of the subordination on

14  distribution and resolve it in that manner.  I believe that Mr.

15  Bennett may have some additional concerns.  I'll let him

16  address that, and then respond appropriately.

17       Likewise, Your Honor, the Debtors do believe that all of

18  the issues raised by the shareholders and the putative

19  purchasers that are disclosure issues have been resolved

20  through the additional disclosures to the Disclosure Statement,

21  and that any other issues raised in those objections really are

22  confirmation issues to be decided at a later time.  And at this

23  point, Your Honor, I would propose to let the objecting parties

24  present their objections to you.  And then I will provide a

25  more detailed response to each objection as appropriate.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

Exhibit C

19

1    THE COURT:  Very well.

2    MS. HARNER:  Thank you.

3    MR. FOURNIER:  Good morning, Your Honor, David

4  Fournier on behalf of the Ad Hoc Committee of Senior Secured

5  Noteholders.  I'd like to introduce to the Court and move the

6  admission pro hac vice of Bruce Bennett of the Hennigan Bennett

7  & Dorman firm.  We will file written pro hac papers later on

8  today.

9    THE COURT:  Welcome, Mr. Bennett.

10   MR. BENNETT:  Thank you very much, Your Honor.  I

11 think the Debtor is right that we have made a lot of progress

12 as between the Senior Secured Noteholders and the Debtors

13 concerning the disclosure issues.  I want to just make a couple

14 of preparatory points so that the record is completely clear.

15 And then I want to narrow in on the single remaining disclosure

16 issue that I think is here.  First of all, the fact that we've

17 been able to work out our differences relating to disclosure

18 does not mean that we accept the Debtor has the ability to

19 implement what is a rather creative reinstatement.  As the

20 Court may have noticed if you carefully went through the papers

21 -- and I wouldn't blame if you if you didn't, given the time --

22 this debt instrument's maturity is not actually being

23 reinstated.  They are using the reinstatement power in order to

24 pay the notes at a discounted figure on the effective date.

25 But no notes will actually be reinstated.  It's kind of I'll

**Exhibit C**

20

1  call it a fictional reinstatement understanding.  And I'm

2  intentionally using a little bit of a loaded word.

3      There -- this is going to raise a number of issues.  I

4  concede they're confirmation issues, but I want to make clear

5  that the Senior Secured Noteholders, many of whom don't even

6  know about this change because it came out midnight Eastern

7  time Friday night -- and I've gotten some e-mails off, but I'm

8  not sure that everybody's read them and understood what they

9  said yet.  Whether that's acceptable or not acceptable, and

10 whether it's objectionable or not objectionable is something

11 we're just going to have to leave for another day.  I do want

12 the Court to understand that it is a bit controversial.

13     Secondly, just a clarification.  And I should have

14 mentioned this to Mr. Heiman last night.  And I really just

15 forgot.  The Disclosure Statement states that the commencement

16 of the bankruptcy case constituted an event of default under

17 the Senior Secured Notes.  And of course that's certainly true.

18 But as is set forth in our summary judgment papers and in the

19 complaint in the adversary proceeding, there were actually

20 defaults that existed prior to the commencement of the

21 bankruptcy case.  And while that may sound like just a

22 technical difference, under the Dow Corning case, which is

23 becoming authority everyone wants to refer to relative to the

24 payment of default interest, the existence of pre-filing

25 defaults, apparently at least under the Dow Corning Court's

Exhibit C

1  view of the world is significant in terms of determining

2  entitlements to default interest.

3       THE COURT:  Were defaults declared, or they were --

4       MR. BENNETT:  It was a non-payment default.

5       THE COURT:  Okay.

6       MR. BENNETT:  It was not covenant default.  Excuse me,

7  it was a payment default, not a covenant default.  Finally,

8  with respect to the remaining disclosure issue, this is just

9  what I think is -- I thought it was a residue of history, and

10  it was a part of the Disclosure Statement that is

11  schizophrenic.  And the part of the Disclosure Statement that

12  raises the issue is pretty close to one of the pages you were

13  directed to earlier.  It's on page 125.  And the section of the

14  Disclosure Statement is entitled -- and I'm in the blackline

15  version --

16       THE COURT:  Okay.

17       MR. BENNETT:  -- "Termination of subordination rights

18  and settlements of related claims and controversy."  Now, if

19  the Debtor's proposal which I think I understand is to

20  reinstate the Senior Secured Notes in accordance with their

21  terms, then they have to comply with Bankruptcy Code Section

22  1124.  And one of the things that's required under Section 1124

23  -- there are four -- is that all legal, equitable and

24  contractual rights of the reinstated creditor have to be

25  preserved.  Well, if subordination rights are terminated or

Exhibit C

1   changed or altered or modified in any way, I would think it

2   follows quite naturally that the last prong of the Section 1124

3   reinstatement test isn't met.  Now, it is certainly the

4   Debtor's prerogative, although it would waste a lot of money,

5   to send out a Disclosure Statement that meets the requirements

6   of three of the four unimpairment provisions, explicitly

7   doesn't meet the fourth requirement of the unimpairment

8   provisions, doesn't solicit any votes from the Senior Secured

9   Noteholders, we wind up at a confirmation hearing and have to

10  throw up our hands because the Class was in fact not

11  unimpaired, and no votes were in fact solicited.

12        So we offered the suggestion that if the -- not conceding

13  for the minute if there's no authority to do so, that the

14  Debtor can in fact reinstate the Senior Secured Noteholders, we

15  at least offer the idea that if the Debtor is trying to

16  reinstate the Senior Secured Noteholders, that they in fact

17  expressly comply with the four requirements of 1124, or at

18  least try to.  And it seems that terminating the subordination

19  rights, the only ones in the case that I'm aware of, Your

20  Honor, are the rights that benefit the Senior Secured

21  Noteholders.  That would seem to blatantly contradict 1124.

22        THE COURT:  So you'd suggest -- even though they don't

23  acknowledge that they're impaired, you would suggest that they

24  solicit their votes.

25        MR. BENNETT:  No, I suggest that they -- I don't think

Exhibit C

1  that's the way it works.  They vote no.  What I suggest that

2  they do is not purport to terminate subordination rights with

3  respect to an unimpaired position, and say they're preserved to

4  the fullest extent required by 1124.  That would seem to be the

5  logical thing to do.  But I fairly concede that as a Creditor I

6  don't control what the Debtor's propose.  I just think as a

7  matter of efficiency to try to get where we want to go in this

8  case, I agree with everyone, which is out, that at least we try

9  to be consistent going into the confirmation process.  Thank

10  you, Your Honor.

11        THE COURT:  Thank you.

12        MR. GREENFIELD:  Good morning, Your Honor, Harry

13  Greenfield, Buckley King on behalf of I think as we've defined

14  them certain shareholders.  I must start by -- Mr. Heiman

15  pointed out to me yesterday, I believe correctly so since one

16  shareholder is a good friend of his, that the -- one of my

17  shareholders sold their stock, and he didn't tell me.  So I

18  have at least one of the group that is no longer a shareholder.

19  However, we still have a series --

20        THE COURT:  Send him a bill anyway.

21        (Laughter)

22        MR. GREENFIELD:  I agree.  In any event, there were

23  four items that we raised in our objection to the Disclosure

24  Statement, Your Honor.  They dealt with the disclosure of the

25  asbestos related and silica related claims, the documents that

**Exhibit C**

46

1  may let you put the evidence on.  Are you the gentleman who

2  called and asked whether I'd have time to hear witnesses?

3           MR. COFFEY:  it was my local counsel, Your Honor.

4           THE COURT:  Okay.

5           MR. COFFEY:  Yes.

6           THE COURT:  And I said I didn't think so.  So let's

7  just hold it and see.

8           MR. COFFEY:  We were appropriately discouraged, but we

9  had to try, Your Honor.

10          THE COURT:  And I -- you know, and I wish I -- and I

11 hope I can accommodate you, but I have a rather full calendar,

12 and I want to get through this hearing.  Go ahead.

13          MR. COFFEY:  Thank you, Your Honor.

14          THE COURT:  Is that it?  Thank you.  Is that everybody

15 on the objection side?  Go ahead.

16          MS. HARNER:  Thank you, Your Honor.  I will reply to

17 the objections in turn, trying not to repeat what the Debtors

18 have already informed the Court of through the reply we filed

19 on Friday, as well as the objection chart.  First, starting

20 with the objection expressed by Mr. Bennett on behalf of the

21 Senior Secured Noteholders.  First, I would like to clarify at

22 least the Debtor's position on any pre-petition defaults.  And

23 I recognize Mr. Bennett may disagree with us, but our knowledge

24 of the pre-petition default situation is as follows, Your

25 Honor.  There is a cross default provision essentially in the

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-929-0191*

Exhibit C

1  documents relating to payment on other debt.  We announced I

2  believe in either late January or early February that we would

3  not be making the interest payment due on the unsecured bonds.

4  And that arguably may be a default under the indenture.  We

5  never received the required notice declaring such default to

6  turn it into a capital E, Event, capital D, of Default, under

7  the documents.  So I think there's some argument between us and

8  Mr. Bennett as to whether or not that was a notice default

9  prior to petition date.  So I'd simply clarify that for Your

10  Honor.

11      Second, Your Honor, with respect to Mr. Bennett's concerns

12  on the subordination language in the Plan, and suggestion that

13  all subordination rights are discharged and terminated, I'm

14  happy to work with Mr. Bennett and the Committee's counsel on

15  appropriate language that would satisfy everyone.  I think as I

16  tried to express to the Court earlier, our position is

17  obviously the contractual rights are whatever they are.  And we

18  are hopeful that the Court will be able to determine any

19  dispute relating to that contractual right either at or before

20  the confirmation hearing.  Mr. Bennett, you know, obviously

21  takes the position that reinstatement doesn't impair the

22  contractual rights.  I'm not sure we disagree with that.  I

23  think our view of the situation is just a little different,

24  that he has no contractual subordination rights as a result of

25  the subordination -- as a result of the reinstatement taking

Exhibit C

48

1   care of that default trigger.  But that can be an argument for
2   a later day.  I would just commit to the Court that we will try
3   to put a reservation of rights or some similar language in the
4   Disclosure Statement to indicate that -- whatever contractual
5   rights they have -- and that matter will be resolved by the
6   Court at the appropriate time.

7         With respect to the shareholder's objection, Your Honor,
8   first with respect to the concern that's been expressed by the
9   Court and the shareholders and others regarding the documents,
10  as I said we will try to make those available as soon as
11  possible.  And we certainly would be willing to commit to
12  provide them on the document website at least 20 days prior to
13  the voting deadline.  I think the required time for voting is
14  25 days.  So that would mean we'd get it out as soon as
15  possible, but no later than 20 days remaining on the voting
16  deadline.  And we believe that would provide parties more than
17  sufficient time to review those documents.  And we would hope
18  that would alleviate the Court's concerns and other concerns on
19  that front.

20        With respect to the releases, Your Honor, I will not make
21  the arguments that you've already stated so clearly.  You are
22  correct, the Debtors certainly are aware of the applicable 3rd
23  Circuit standard under both Continental. PWS Holdings and
24  Zenith.  And we will be well prepared to meet those standards
25  at the confirmation hearing with respect to each party being

Exhibit C

1  deal being offered to the bondholders is the opportunity to buy

2  into the preferred.  That opportunity is available to all

3  bondholders on a pro rata basis.  If they think the preferred's

4  a better value, buy in.  It's the same opportunity being

5  afforded everybody else.  There's no spread of treatment.  If

6  they don't think that the preferred is a better security, don't

7  buy in.  They even have the opportunity to sell their ability

8  to buy in for a period of time.  There's a lot of flexibility

9  built in here.  We, as really the representative of those

10  bondholder interests because the other Unsecured Creditors are

11  passing through, have done everything we can do to protect the

12  interests of bondholders.  I think it's pretty obvious that

13  these guys are really here in their capacity as putative

14  purchasers.  To the extent they can slow this process down,

15  they drive down the value of the business.  They -- by doing

16  so, it gives them a cheaper purchasing pric; something we're

17  not interested in.  So I think you see it for that, and we'll

18  leave it there.  Thank you, Sir.

19          THE COURT:  Thank you.  Anybody else feel compelled to

20  speak?  Mr. Heiman or Ms. Morgan Harner, there are several

21  things that you've committed to changing, and there's some

22  things that I'm going to say now that are going to require I

23  think some -- potentially some other changes.  I know you're on

24  a timetable, but I don't see how -- or let me ask you this.

25  When do you expect or hope that you will -- we will schedule

Exhibit C

63

1  confirmation?

2      MS. HARNER:  Your Honor, I think we had asked for a

3  confirmation hearing in early September.  We believe September

4  is the right time for the confirmation hearing.  We still would

5  like an early September date but obviously would defer to the

6  Court and your docket in setting that.

7      THE COURT:  Well, all right, let me -- I have so many

8  (indiscern.) the disclosure statements with notes, I want to

9  make sure I pick up the --

10      (Pause in proceedings)

11      THE COURT:  In no particular order other than the

12  order of this mess that I have up here --

13      MS. HARNER:  Okay.

14      THE COURT:  All right, I do have some concerns about

15  the mass tort disclosures, principally because I read somewhat

16  of an inconsistency, particularly when you talk about the

17  prospective purchasers leaving the claims with the Debtor.  And

18  that's a negative of the Plan when, in fact, you are basically

19  doing the same thing

20      MS. HARNER:  Your Honor, if I just may address that

21  briefly.  I think the one distinction to be drawn is that under

22  the Plan we are a reorganized company, leaving the claims with

23  the reorganized company, not leaving the claims with a

24  bankruptcy estate.  I think under a 363 sale that would leave

25  all tort claims with the bankruptcy estate, you're forcing the

**Exhibit C**

1   Debtors into a situation where they're going to have to look at

2   and review other options, such as 524(g) trusts or something

3   that my not be nearly as beneficial as the current Plan on the

4   tort claimants for the Debtor's Creditors, which is of course

5   what we're focused on.  We believe that leaving the tort claims

6   with the reorganized company and the assurance that the

7   reorganized company has going forward will allow us to resolve

8   those claims in an efficient manner consistent with our

9   historical settlement levels that will allow us to maintain

10  insurance for an appropriate time period to address those

11  liabilities.  We think leaving those claims with bankruptcy

12  estates with no ongoing operations and simply a pot of money

13  and a pot of insurance is a completely different scenario and

14  raises completely different economic concerns for the

15  stakeholders.

16          THE COURT:  Good.  Now why don't you say something

17  like that?  You give no analysis that I read in here other than

18  the conclusory statement that we believe that we have adequate

19  assurance.  Now, I accept what the Committee suggests is the

20  expertise of Ms. Faulk as far as knowing these claims and the

21  like.  I gather principally, based on what I've heard, the

22  analysis of the adequacy of insurance (indiscern.) is based to

23  a large extent on her analysis and review.  Has there been any

24  other analysis and review of those claims other than internally

25  by the company?

**Exhibit C**

1    MS. HARNER:  Your Honor, the company has never done an

2  actuarial report of it's asbestos, which I know you may be

3  familiar with from other cases --

4    THE COURT:  Then say so.

5    MS. HARNER:  Okay.

6    THE COURT:  Then just tell people.  And tell people

7  that the Committee has examined and whatever.  And tell people

8  why you're coming to that conclusion.

9    MS. HARNER:  Certainly, Your Honor.

10    THE COURT:  I mean, it's your obligation to, at

11  confirmation, to satisfy me that the Plan is feasible.  And I'm

12  not sure how far we'll have to get into that, but if you can't

13  satisfy me in some fashion, then we're going to have a

14  feasibility issue, aren't we?

15    MS. HARNER:  Correct.

16    THE COURT:  Okay.  And similarly, when you discuss the

17  prospective offers and whatever, it seems to me that's fair

18  game for you to say that's one of the issues.  And I think it's

19  important.  And I didn't pick it up, and I made that mistake in

20  this hearing.  I didn't understand how the Committee was fully

21  constituted, and I think that may be an important piece of

22  information that people ought to know in the determination of

23  voting, just as it's -- I think you should tell them that the

24  prospective offerors that have contacted you, what we're

25  calling the consortium, is made up of people who claim to be

**Exhibit C**

66

1  bondholders but are also prospective purchasers.  And their

2  view and Committee's view are different on certain of these

3  points.

4          MS. HARNER:  Will do, Your Honor.

5          THE COURT:  Now, I've got a problem, as I said

6  earlier, with the documents not being available.  The 20 days

7  works for me, provided you say in the disclosure statement,

8  "These documents will be on the following websites no later

9  than," and you give them the citation to the websites.  Because

10  if you're mailing them, by the time they get them, they

11  basically should be up on the web.  And give them the usual

12  encouragement that one does in order before you make your

13  decision, go on the web.  Also please give them -- there are

14  still a few people out there that may not have access that way.

15  So let's give them a telephone number that they can call and

16  get a copy free of charge.

17          MS. HARNER:  Will do.

18          THE COURT:  I've got some issues with the third party

19  releases.  I agree that they're burdens on you and that that's

20  a confirmation issue.  Now, how are we going to sequence the

21  issue of getting the issues raised by Mr. Bennett resolved or

22  do we have to get them resolved concerning the 1124 issues?  Do

23  we need those resolved before we go to confirmation?

24          MS. HARNER:  Your Honor, if I may suggest, that may be

25  something we want to discuss in the context of the status

1    hearing after we finish on the disclosure, but the Debtor's
2    view is it would be most efficient and beneficial to the
3    confirmation process if we could resolve those either at the
4    confirmation hearing or prior to that time.

5        THE COURT:  On the structural subordination issue, I
6    think you should deal directly with it.  You've got a Committee
7    that finds that risk a more acceptable risk than going in
8    another direction.  You've got at least one prospective
9    purchaser who sees it differently.  Just lay it out.  Let
10   people decide.  I mean, if the bondholders are truly as
11   represented by the Committee and involved, then they're going
12   to accept the recommendation of the Committee.  But make a, you
13   know, a -- that's up to them.  Just tell them the way it is.

14       MS. HARNER:  We will enhance the existing disclosure
15   on that, Your Honor.

16       (Telephone disconnects)

17       THE COURT:  Goodbye.

18       (Laughter)

19       THE COURT:  It's tempting, isn't it?

20       (Laughter)

21       THE COURT:  I wonder how the people who are here for
22   the 11 o'clock feel.  Now, I don't know what to say about a
23   meeting that hasn't taken place that may change some of the --
24   you're having a meeting tomorrow, whether you feel it's
25   appropriate to disclose -- this isn't going to be out by --

Exhibit C

1 before the meeting.  If you feel it's successful, obviously

2 you're going to be -- perhaps more dramatic changes if it's not

3 successful, I'll leave it to you to you know -- you may want to

4 say you met and here the position is the same.  I'll leave it

5 to you to do that.  I mean you've got to satisfy me at the

6 appropriate time that the Plan is in the best interest to

7 Creditors.  If Mr. Coffey and Mr. Kelly are as pumped up then

8 as they are now, it's going to be a long hearing and I will be

9 prepared to take testimony at that time.  And if you can't meet

10 your burden, then it's going to be a lot of paper and a lot of

11 trees that have died for nothing --

12          MS. HARNER:  Understood, Your Honor.

13          THE COURT:  -- because I'm not afraid to deny

14 confirmation if you can't satisfy the confirmation standards.

15 I think you should explain what at least on the face appear to

16 be inconsistent stock valuations and -- as discussed by Mr.

17 Coffey.  I think it makes sense in some fashion to include the

18 Committee's analysis of why they think the Michigan Limestone

19 Operation's arrangement is a fair arrangement.  They can be

20 wrong, but at least if that's the basis of the analysis, then

21 say so.  And if one of the factors that you determine to not

22 bring potential fraudulent conveyance actions out of the

23 necessity of peace and stability for ongoing operations, then

24 tell the people that.  Now, nobody mentioned, I was surprised,

25 substantive consolidation as an issue.  And I'm a little

Exhibit C

1  confused as to what you really want.  Do you want substantive

2  consolidation for the 5 seconds that it takes me to put my name

3  on a piece of paper and poof, then it's unconsolidated again?

4  I'm not sure what you want.

5      MS. HARNER:  Your Honor, basically I think for ease

6  and efficiency under the Plan, we simply are proposing

7  substantive consolidation for determining the claims against

8  all of the Debtors and the appropriate treatment to be provided

9  to those claimholders on behalf of all of the Debtors.  And in

10  large extent, that makes sense here, Your Honor, because for

11  instance class 3, which is the class of the senior secured note

12  holders, is an obligation that is guaranteed by all of the

13  Debtors.  So it essentially is a claim against all of them in

14  any event.  And the remaining classes that are either receiving

15  100 cents on the dollar reinstatement or equity under the Plan

16  we don't believe it's an issue that affects them.

17      THE COURT:  Well, how does it play with the tort

18  claimants?  Do they have claims against everybody?

19      MS. HARNER:  I think, Your Honor, since those claims

20  are being reinstated and the reinstatement that we are

21  providing is reinstatement of their legal rights and remedies,

22  I think their legal rights and remedies with respect to the

23  particular Debtor are reinstated, and that particular Debtor's

24  defenses and arguments with respect to those claims are

25  reinstated.  Because that's not a payout claim issue I don't

**Exhibit C**

1 believe substantive consolidation truly impacts them.

2      THE COURT:  I'll think about that.  I'm not sure I

3 disagree with you, but I'm not sure I totally agree with you

4 either.

5      MS. HARNER:  Certainly, Your Honor, and we will be

6 prepared to provide more information at confirmation.

7      THE COURT:  All right, let's talk about timing.  How

8 much time do you need to make these changes and have your

9 meeting and do all the other things you have got to do in the

10 next whatever number of days?  I think -- maybe we should back

11 up to the timing.  The problem with an early September

12 confirmation is I'm not here.  And I tried awfully hard to not

13 have confirmation hearings and other hearings that were not

14 absolute emergencies out of Delaware because I don't think it's

15 fair to the people around the country who hire Delaware lawyers

16 to then have to make the Delaware lawyers travel.  I know it

17 doesn't matter to the Cleveland people, it's six of one, half a

18 dozen of another where they fly to, but there are some people

19 who have spent good money to hire local counsel here and

20 they're handling the substantive matters.  And I don't think

21 that's fair.  I am here the end of September and I think that

22 probably makes more sense, given the time that we're talking

23 about.  So let me --

24      (Pause in proceedings)

25      THE COURT:  In order for me to be able to give you the

Exhibit C

1  amount of time that my guess tells me you'll need, I'm looking

2  at the 29th of September. And I'm just going to block the day

3  out. Now, I know you have an omnibus on the 28th. My

4  suggestion is we just move the omnibus to the 29th and we make

5  that ONCO day.

6      MS. HARNER: That's fine, Your Honor.

7      THE COURT: All right -- which takes a little bit of

8  pressure of, not a lot. It means you don't have to work

9  Saturday and Sunday maybe to get the disclosure statement out.

10  And who knows, maybe good things will happen tomorrow and

11  you'll want to delay sending it out.

12      MS. HARNER: Your Honor, we will try to submit to you

13  a blackline of the amended disclosure statement with the

14  proposed order by the end of the week so that you have it

15  before you leave Delaware.

16      THE COURT: Well, I guess the good news and the bad

17  news is submit it when it's ready, but don't worry, e-mail

18  works all the way up to Massachusetts.

19      MS. HARNER: Terrific.

20      THE COURT: It's just one of those wonderful things in

21  the modern world. Does it help you folks if I make the hearing

22  start a little later or are you coming in the night before

23  anyway, you out of town people?

24      UNIDENTIFIED SPEAKER: The night before.

25      THE COURT: Excuse me?

Exhibit C

1    UNIDENTIFIED SPEAKER:  Make it early.

2    THE COURT:  Make it early?  7 a.m.?  I know the

3  security guys get crazed though.  You want it make it 9:30?  It

4  gives every body time -- listen, you're not going to start 'til

5  10 anyway because you're going to be meeting out in the hallway

6  to resolve those things anyway.  You want to come here earlier

7  and start those meetings, it's okay with me.  All right.  So

8  it's not shocking to anybody who's been listening for the last

9  few minutes, I'm -- subject to the changes that we're talking

10  about here, I'm going to overrule the objections and approve

11  the disclosure statement if I'm satisfied it complies with the

12  requests that I've made and the suggestions that others have

13  made that the Debtor has accepted.

14    MS. HARNER:  Thank you, Your Honor.

15    THE COURT:  All right.  So an order will be

16  forthcoming and -- which leaves us two other matters.  Let's

17  deal with the one involving the subordinated noteholders versus

18  the senior noteholders and see how that dovetails in with this.

19    MR. BENNETT:  Good morning, Your Honor.  Bruce Bennett

20  and Ben Truitt from Hennigan, Bennett & Dorman and David --

21  well, different local counsel.  There was a conflict so we had

22  to hire separate local counsel for the adversary proceeding.

23  As Your Honor knows, the complaint was filed about 3 days ago.

24  Answers were due -- responses were due yesterday.  The first

25  day by which the Plaintiff could file a Motion for Summary

**Exhibit C**

1   Judgement was in the middle or the beginning of last week or

2   the end of the week before.  A couple of days after that date

3   the Plaintiffs filed a Motion for Summary Judgement essentially

4   contending that what is involved here is an issue of contract

5   construction.  The terms are not ambiguous and the Court can

6   resolve the matter as a matter of law.

7          Three things have happened since then.  Let me bring you

8   up to date on all three and then let me propose how I think we

9   ought to go forward.  The first relevant thing that happened is

10  as required by the local rules, I have managed to meet and

11  confer with the attorney for the Indentured Trustee, the

12  attorney for the Debtor, and the attorney for the Committee.

13  The Committee would like to intervene -- one of the things

14  we'll talk about in a minute -- about whether or not there's

15  any discovery that anybody wants to take or whether there's

16  general agreement that this really is an issue of contract

17  construction.  And I am pleased to report and I'll go --

18  concededly Mr. Heiman was tentative last night, he wanted to

19  speak with his people -- everyone was of the view that there is

20  no discovery required, that it really is an issue of contract

21  construction.  I suspect that there will be an assertion that

22  there's some statutory matters that we'll have to be addressed

23  as well.  So I think I can report that there is widespread

24  agreement that this an issue that might actually by resolved in

25  motion practice as opposed to with an actual trial involving

Exhibit C

74

1   witnesses.  And because discovery might not be necessary, I

2   think only the Debtor really needs to be heard from as the

3   final matter on that point.  We might actually be able to

4   proceed expeditiously to hear the merits with a minimum of

5   posture.

6       The second development that happened since we filed our

7   complaint and the Summary Judgment Motion, of course, is that

8   the Debtor modified the Plan.  Now it was pointed out in the

9   hallway to me that the Summary Judgment Motion certainly as a

10  matter of context deals with the Plan as it was before Friday

11  at midnight.  And certainly the context has changed.  The legal

12  matters that we asked the Court to resolve in the Summary

13  Judgment Motion hasn't changed.  In light of where the Court

14  has set the confirmation hearing, maybe we can -- we have a

15  little more time to play with.  I think that from the

16  Plaintiff's perspective, we could live with the existing

17  Summary Judgment Motion and -- as teeing up the relevant legal

18  issues -- and deal with the change in context in our reply, if

19  that would please the Court.  We can also very rapidly modify

20  the Summary Judgment Motion so that isn't consistent with the

21  current context.  Again, I don't think the legal issues that

22  we're going to ask the Court to decide from the moving party's

23  perspective are going to change in any way.  But I do think

24  there will be, I think you've heard this morning intimated, a

25  new defense to the Summary Judgment Motion, which is that

Exhibit C

1  somehow reinstatement releases the contractual rights against

2  the subordinated debt holders.  We disagree with that, but

3  that's an issue that I suspect Your Honor's going to have to

4  decide.  So that's the one issue that we need to resolve, would

5  everyone rather negotiate a new briefing schedule now where

6  we'll tee up with an entirely new Summary Judgment Motion which

7  will only be new as to context, won't be new as to legal

8  issues, or can everyone live with the existing pleading,

9  understanding the context has slightly changed but the legal

10 issues really have not.

11      The second change is also buried in the Plan.  We didn't

12 comment on it because there's nothing we can do about it, but

13 the Indentured Trustee greeted with our complaint and Summary

14 Judgment Motion apparently decided that it wanted to get out of

15 the way.  And so as a slightly unusual -- at least in my

16 experience -- but the Indentured Trustee will no longer be the

17 disbursing agent for the debt.  So they've crossed themselves

18 out; they've taken themselves out of the chain of distribution.

19 I can't be entirely certain why they did that, but I suspect

20 they didn't want to be in the way of this adversary proceeding

21 and thought there was a chance that the senior noteholders

22 might actually be right.  So we now are confronted with perhaps

23 the need -- we've already sued the Debtors, which are the

24 initial disbursing agent.  In the terms of the indenture, the

25 Debtors are also bound to enforce the subordination provisions

**Exhibit C**

1   and if there's a requirement, make the distribution directly to

2   the senior debtholders.  But there's actually another solution

3   to the Indentured Trustee's desire to get out of the way, and

4   that is as a formal technical legal matter, there's only one

5   holder of the bonds, and that's DTC.  Everyone else is just

6   beneficial holders that are -- appear on DTC's records.  The

7   actual bonds sit at DTC.  So I think that a way perhaps to make

8   absolutely, positively sure that every conceivable correct

9   party is before the Court so that we all have to do this once,

10  which is really my drive here, is what we could by the end of

11  the week amend the complaints solely by adding additional

12  claims, not changing anything that has already been sent to

13  anybody else in this case, to add the DTC as an additional

14  Defendant.  And that will, as a formal matter, we will actually

15  have named someone in the chain of distribution because they

16  just took the Indentured Trustee out of the chain of

17  distribution.

18      So in terms of scheduling, currently, if everyone that's

19  in the case right now -- it would be great, I think it would

20  get things resolved expeditiously and I thought I heard a

21  consensus to do that -- the Summary Judgment Motion that was

22  filed is set for hearing at the next omnibus, which is August

23  24th.  As I said before, if people are content to proceed with

24  the moving papers that we have already filed, understanding

25  that context has changed, not by anything we did and then we'll

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Exhibit C

77

1  deal with the change in context in our reply, that's fine with
2  me.  If the consensus is that that hearing ought to be
3  continued a week or two so as to permit the filing of a new
4  Summary Judgment Motion with current context, that's okay with
5  us too.  I just want to get the actual issue resolved.  I don't
6  want to waste anyone's time or energy or be confusing --
7          THE COURT:  Well, I'd just as soon --
8          MR. BENNETT:  -- about context.
9          THE COURT:  -- move it along.  I'd very much like to
10  hear it at the end of August if the parties can get their
11  response and you get your reply done.  I'm not sure who's
12  representing whom and other people have a right to take a
13  vacation so --
14          MR. BENNETT:  Okay, I'll stand by and hear what other
15  people want to do.
16          THE COURT:  Fine, thank you.
17          MR. WEINTRAUB:  Good morning, Your Honor, William
18  Weintraub of Pachulski, Stang, Ziehl, Young, Jones & Weintraub
19  for the Indentured Trustee.  As a preliminary matter, I'd like
20  the record to be clear that the reason the Plan was changed was
21  not because the Indentured Trustee thinks that the senior debt
22  is correct.
23          THE COURT:  I didn't even write that down.
24          MR. WEINTRAUB:  Thank you, Your Honor.  With respect
25  to Mr. Bennett's suggestion, what the Indentured Trustee would

Exhibit C

78

1  like would be to see a new complaint and a new motion, and in

2  particular, a new brief. We don't want to be responding to

3  arguments we think Mr. Bennett may be making with respect to

4  reinstatement, we would like to see his brief on reinstatement

5  so we have something to respond to. I think because we need to

6  do it that way, August 24th may not be the right date for the

7  return date on the motion that is yet to filed. Clearly it

8  could be before September 29th, but I think sometime between

9  the 24th and September 29th.

10       THE COURT:  All right. I'm not going to force you to

11 respond to that. If everyone was in agreement, that's fine.

12 But procedurally, you're right and I'm not going to bend the

13 procedure rules because we're in a rush. You file your amended

14 complaint, and if you folks can agree on the sequencing once

15 everybody has that, then just submit an order and scheduling.

16 If it's not going to be the 24th of August, then we'll try to

17 do it before the confirmation hearing. And it may require you

18 to travel to Worcester, Massachusetts, which is lovely in the

19 fall.

20       MR. BENNETT:  I'm indifferent to Worcester or

21 Delaware.

22       THE COURT:  I understand. But Pachulski, Stang isn't

23 necessarily, but they're the ones that are asking so I'm not

24 all that sympathetic.

25       MR. WEINTRAUB:  I'm from the New York office, Your

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Exhibit C

1  Honor, I'm happy to go to Worcester.

2       THE COURT:  Fine, great.  So I don't think I have to

3  hear from the other potential parties.  You file the new

4  complaint and we'll go the sequencing.  You guys get on the

5  phone after you've filed it.  If you can agree on the timing

6  then just tell me what you've agreed to.  If you can't, I'll

7  just set the time.

8       MR. BENNETT:  Okay.  The new complaint will not affect

9  the existing Defendants at all, so the --

10      THE COURT:  So they know what's coming so they can get

11 started.

12      MR. BENNETT:  Okay, the new complaint will not change

13 anything, I don't think, as to the existing Defendants.

14      THE COURT:  Okay.

15      MR. BENNETT:  Because I don't want to start a new time

16 running for the first day to file a Summary Judgment Motion.

17 We can file the Summary Judgment Motion right now.

18      THE COURT:  Fine, okay.

19      MR. BENNETT:  So I'm going to -- not going to change

20 the --

21      THE COURT:  Do whatever you want --

22      MR. BENNETT:  Okay.

23      THE COURT:  -- I'm just not forcing them to respond to

24 the new context without you setting it for them first --

25      MR. BENNETT:  That's --

Exhibit C

1    THE COURT:  -- that's all I'm saying.

2    MR. BENNETT:  Okay we will get the new Summary

3  Judgment Motion filed as rapidly as possible and set the

4  hearing by agreement if we can.

5    THE COURT:  Fine.  I think it's in everybody's

6  interest that we get this resolved before confirmation if at

7  all possible.

8    MR. BUSENKELL:  Good morning, Your Honor, Michael

9  Busenkell with Morris, Nichols, Arsht & Tunnell on behalf of

10  the Committee.  If I could, I'd like to move the admission pro

11  hac of Ken Pasquale of the Stroock & Stroock & Lavan law firm.

12  He is a member of the New York Bar and in good standing and

13  he'd like to address these matters.

14    THE COURT:  Very well.

15    MR. BUSENKELL:  We'll file the papers today.

16    THE COURT:  Fine.

17    MR. PASQUALE:  Your Honor, thank you.  Again, Ken

18  Pasquale.  A couple of points.  I'm not sure we can move quite

19  that quickly, at least from the Committee's standpoint.  The

20  Committee is not a party at the moment to the adversary

21  proceeding.  We did request from the Plaintiffs and Mr.

22  Bennett's firm that they stipulate to the Committee's

23  intervention under the 3rd Circuit standards where the

24  Committee would have an absolute right to intervene in an

25  adversary proceeding, especially one of this nature that

**Exhibit C**

81

1  essentially affects the Plan --

2          THE COURT:  So if they don't stipulate, file a motion.

3          MR. PASQUALE:  Well and we already have and we filed

4  in yesterday.

5          THE COURT:  Okay.

6          MR. PASQUALE:  The motion obviously hasn't been

7  decided and will be decided in due course.  But I think --

8          THE COURT:  Can I take that, Mr. Bennett, that you're

9  not going to so stipulate?

10         MR. BENNETT:  Your Honor, that's correct, the --

11         THE COURT:  Okay.

12         MR. BENNETT:  -- subordination provision, just --

13         THE COURT:  Fine.

14         MR. BENNETT:  Okay.

15         THE COURT:  It's okay.  I get paid to decide these

16  things.  Okay.

17         MR. PASQUALE:  Understood, Your Honor, but that's one

18  issue.  The Committee's going to, assuming you grant that

19  motion, I don't know how much water will have been under the

20  bridge by that time, but we're going to stand on those

21  rights --

22         THE COURT:  Mr. Bennett, you've got 5 days to file

23  your opposition.  Starting today.  Today's day 1.  Nancy would

24  you pull that for me?

25         MR. PASQUALE:  Second point on the discovery, Mr.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

**Exhibit C**

1  Bennett accurately stated that when we spoke earlier we said we

2  wouldn't need discovery, that was before I heard him say in

3  Court today that they now think that there was a prepayment

4  default.  We will need discovery with respect to whether or not

5  the Plaintiffs gave the notice that was required, unless Mr.

6  Bennett wants to stipulate to that fact.  That is now a factual

7  issue that I believe -- and we'll see after he files his motion

8  -- but I believe that's going to bear upon the issues here and

9  if so, we're going to ask for discovery on that issue.

10      The next is Mr. Bennett's comment that he has no plans to

11  amend his complaint.  I guess I can't force him to do that, but

12  I think just changing the Summary Judgment Motion doesn't

13  address the fact.  If things stand the way we are and the

14  Committee is a party, I think we would more than likely move

15  for summary judgment on the mootness basis based on that

16  initial complaint.  I think it is the Plaintiff's burden to

17  frame the issues in its complaint based upon --

18      THE COURT:  All right, I've heard enough.  Everybody

19  do what they want to do and when you're ready procedurally,

20  I'll hear it.  I mean, enough of the poisoning of the well.

21  Mr. Bennett started out by saying he hoped this would move

22  quickly.  It's clearly not going to move quickly.  Everybody's

23  going to preserve their rights and hopefully we'll get

24  confirmation before the snow flies.  Enough.  File your papers

25  and we'll deal with it in the ordinary course.  I don't have to

**Exhibit C**

1  waste time listening to you guys bicker about things that if

2  you can't agree to, I'm not going to help you agree to it.  Sit

3  down.  File whatever you want to file.  All right, that leaves

4  the --

5          MS. HARNER:  Exclusivity Motion, Your Honor.

6          THE COURT:  All right, do you have an order?

7          MS. HARNER:  We do, Your Honor.  May I approach?

8          THE COURT:  Yes.

9      (The Court receives document)

10         THE COURT:  All right, I'm extending exclusivity

11 through -- the solicitation period through October 20th,

12 exclusive filing period through August 21st.

13         MS. HARNER:  Thank you, Your Honor.

14         THE COURT:  Now, I think there was one other matter

15 that I had overlooked.  Is there Relief from Stay in here?

16 Number 4 on the list?

17         MS. HARNER:  Your Honor, that's been adjourned as well

18 until the August 24th hearing.

19         THE COURT:  Okay, I didn't realize that.  All right,

20 does that take care of the agenda?

21         MS. HARNER:  It does, Your Honor.

22         THE COURT:  All right, thank you very much.  See you

23 soon.

24         MS. HARNER:  Thank you.

25     (Court adjourned)

*Writer's Cramp, Jnc.*
*Certified Court Transcribers*
*732-329-0191*

Exhibit C

84

```
 1                        CERTIFICATION
     I certify that the foregoing is a correct transcript from the
 2   electronic sound recording of the proceedings in the above-
     entitled matter.
 3

 4   _____              8-3-04
     Signature of Transcriber                Date
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

Exhibit C